### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

IN RE:

       **THOMAS W. OLICK,**       :      **Chapter 13**
           **Debtor.**       :
                          :      **Bky. No. 07-10880 (ELF)**
_____ :
                          :

**THOMAS W. OLICK,**       :
                          :

       **Plaintiff,**       :
                          :      **Adv. No. 07-052**

       **v.**       :
                          :

**JAMES KEARNEY, et al.,**       :      **Adv. No. 07-060**
                          :

       **Defendants.**       :
                          :

# M E M O R A N D U M

## I.  INTRODUCTION

In the above adversary proceedings, Plaintiff Thomas W. Olick ("the Debtor") asserts,

inter alia, that Defendants Knights of Columbus ("the Knights"), James Kearney and Thomas

Jenkins (collectively, "the Knights Defendants") unlawfully discriminated against him because of

his age.[1]  This court granted summary judgment in favor of the Knights Defendants on the

Debtor's age discrimination claim by Order dated March 17, 2008.[2]  The Debtor filed a motion

_____

[1]     The Debtor originally asserted other claims against another defendant, Aetna Life
Insurance Co. ("Aetna").  The Debtor and Aetna have reached a settlement.  See In re Olick, 2008 WL
3837759, at *4 (Bankr. E.D. Pa. Aug. 12, 2008).

[2]     See Adv. No. 07-060, Docket Entry No. 242.  In his Complaint, see Adv. No. 07-052,
Docket Entry No. 1, the Debtor also  asserts a retaliation claim, i.e., he contends that the Knights

for reconsideration on May 29, 2008. By Order dated June 3, 2008, the court determined that it

would reconsider the merits of its decision granting summary judgment to the Knights

Defendants and requested further briefing on the issue. After further briefing and oral argument,

the matter is ready for decision.[3]

For the reasons set forth below, the court reaffirms its decision to grant summary

judgment to the Knights Defendants on the Debtor's age discrimination claim.


## II.  LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c),[4] summary judgment should be granted when the

"pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). The standard for evaluating a motion for summary judgment under

Fed. R. Civ. P. 56 is well established and has been stated in numerous written opinions in this

district. E.g., In re Klayman, 333 B.R. 695, 698-99 (Bankr. E.D. Pa. 2005); In re Lacheen, 2005

WL 1155257, at *2 (Bankr. E.D. Pa. Apr. 28, 2005); In re Lewis, 290 B.R. 541, 545 (Bankr. E.D.

Pa. 2003); In re Newman, 304 B.R. 188, 192-93 (Bankr. E.D. Pa. 2002).

Before granting a motion for summary judgment, a court must find that the motion

---

retaliated against him for asserting age discrimination claims in state court. The retaliation claim
survived the Knights Defendants' Motion for Summary Judgment.

[3]      A detailed recitation of the procedural history of these proceedings and related litigation
is set forth in In re Olick, 2008 WL 3837759, at *1-4. It is unnecessary to review that history for
purposes of this Memorandum regarding the age discrimination claim.

[4]      Fed. R. Bankr. P. 56 makes Fed. R. Civ. P. 56 applicable to adversary proceedings in
bankruptcy court.

alleges facts that, if proven at trial, would require a directed verdict in favor of the movant.  See

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  If the movant meets this

initial burden, the responding party may not rest on his or her pleadings, but must designate

specific factual averments through the use of affidavits or other permissible evidentiary materials

that demonstrate a triable factual dispute.[5]  Fed. R. Civ P. 56(e)(2); Celotex Corp. v. Catrett, 477

U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-50, 106 S. Ct. 2505, 2510-11 (1986).  Such evidence must be sufficient to support a factual

determination in favor of the nonmoving party.  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is

insufficient.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct.

1348, 1356 (1986).  If the party opposing the motion believes that summary judgment is

premature, Rule 56(f) requires the party to present by affidavit the reasons why the party is

presently unable to submit evidence in opposition to the motion.  Celotex, 477 U.S. at 326 & n.6,

106 S. Ct. at 2554 & n.6.

---

[5]      The parties' respective burdens of proof also play a role in determining the merits of a
summary judgment motion:

> [W]here the movant is the defendant, or the party without the burden of proof on the
> underlying claim, the movant still has the initial burden of showing the court the absence
> of a genuine issue of material fact, but . . . this does not require the movant to support the
> motion with affidavits or other materials that negated the opponent's claim. In contrast,
> where . . .  "the party moving for summary judgment is the plaintiff, or the party who
> bears the burden of proof at trial, the standard is more stringent."  National State Bank v.
> Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992).

In re Newman, 304 B.R. at 193 (quoting Adams v. Consolidated Rail Corp., 1994 WL 383633, *1-*2
(E.D. Pa. July 22, 1994)).

In considering the evidence submitted in support of and in opposition to a summary

judgment motion, the court's role is not to weigh the evidence, but only to determine whether

there is a disputed, material fact for determination at trial.  <u>Anderson</u>, 477 U.S. at 249-50, 106 S.

Ct. at 2510-11.  "[T]he mere existence of <u>some</u> alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."

<u>Id.</u> at 247–248, 106 S. Ct. at 2510 (emphasis in original).  A dispute about a "material" fact is

"genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-

moving party.  <u>Id.</u> at 248, 106 S. Ct. at 2510.  All reasonable inferences must be drawn in favor

of the nonmoving party and against the movant.  <u>United States v.717 S. Woodward St.</u>, 2 F.3d

529, 533 (3d Cir. 1993).


### III.  DISCUSSION

**A.    The Parties' Respective Evidentiary Burdens Under the ADEA**

To prevail on a claim of age discrimination under the federal Age Discrimination in

Employment Act, 29 U.S.C. § 621 <u>et seq</u>. ("ADEA"),[6] a plaintiff must prove that his or her age

"actually motivated" and "had a determinative influence" on the employer's termination

---

[6]       The relevant provision is 29 U.S.C. §623(a)(1), which provides:

(a) Employer practices. It shall be unlawful for an employer–

(1) to fail or refuse to hire or to discharge any individual or otherwise
discriminate against any individual with respect to his compensation,
terms, conditions, or privileges of employment, because of such
individual's age.

decision. <u>Fasold v. Justice</u>, 409 F.3d 178, 183-84 (3d Cir. 2005) (quoting cases).[7]   The plaintiff

may meet this burden by presenting either "direct evidence" or "indirect evidence" of

discrimination.  <u>E.g.</u>, <u>id.</u>

Under the "direct evidence" approach, a plaintiff must prove that the employer "placed a

substantial negative reliance [on the plaintiff's age] in reaching [its] decision to fire him."  <u>Fakete

v. Aetna, Inc.</u>, 308 F.3d 335, 338 (3d Cir. 2002) (quoting <u>Conners v. Chrysler Fin. Corp.</u>, 160

F.3d 971, 976 (3d Cir. 1998) and <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277, 109 S. Ct.

1775, 1805 (1989)) (internal quotations omitted).  If the plaintiff meets that burden, the burden

shifts to the employer to prove that it would have taken the same action regardless of the

plaintiff's age.  <u>Fakete</u>, 308 F.3d at 338.

Under the "indirect evidence" approach, there is a three (3) step burden shifting process

derived from the Supreme Court's decision in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792,

93 S.Ct. 1817 (1973).[8]

---

[7]   In addition to the ADEA, the Debtor also asserted age discrimination claims under
certain provisions of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. Ann. §§46a-51,
46a-60 and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §§951, 955(a).
Presumably, the Debtor raised these claims because: (1) the Knights' management office is in
Connecticut and (2) at all relevant times, the Debtor resided and worked in Pennsylvania.  In my analysis,
I will refer only to  federal case law because the courts in both Connecticut and Pennsylvania construe
their respective anti-discrimination statutes consistently with their federal counterparts.  <u>See</u> <u>Kelly v.
Drexel Univ.</u>, 94. F.3d 102, 105 (1996); <u>Kroptavich v. Pennsylvania Power  & Light Co.</u>, 795 A.2d 1048,
1055 (Pa. Super. Ct. 2002); <u>Santos v. Brooks Pharmacy</u>, 2008 WL 185534, at *2 (D. Conn. Jan 18,
2008); <u>Jacobs v. General Elec. Co.</u>, 880 A.2d 151, 156 (Conn. 2005); <u>Levy v. Comm'n on Human Rights
and Opportunities</u>, 671 A.2d 349, 355 (Conn. 1996); <u>Kliger v. St. Luke's Found., Inc.</u>, 2008 WL 496133,
at *9 (Conn. Super. Ct. Jan. 31, 2008) (unpublished).

[8]   I will refer to this process as "the <u>McDonnell Douglas</u> Analysis."

### 1. **Step 1**

To establish a <u>prima facie</u> age discrimination/termination case, a plaintiff must prove: "(1) that he was at least forty years old, (2) that he was fired, (3) that he was qualified for the job from which he was fired, and (4) that he 'was replaced by a sufficiently younger person to create an inference of age discrimination.'" <u>See, e.g.</u> <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 n.4 (3d Cir. 2006) (quoting <u>Fakete</u>, 308 F.3d at 338); <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc); <u>see</u> <u>also</u> 29 U.S.C. §631(a).

### 2. **Step 2**

If the plaintiff makes out a <u>prima facie</u> case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge." <u>Keller</u>, 130 F.3d at 1108.

### 3. **Step 3**

If the defendant satisfies its burden under step two (2), step three (3) is reached.

> The plaintiff may then survive summary judgment or judgment as a matter of law by submitting evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

<u>Id.</u> (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994)). Stated slightly differently, the plaintiff "must present sufficient evidence to allow a factfinder to conclude that the employer's non-discriminatory reason was a <u>post</u> <u>hoc</u> fabrication, or pretext." <u>Thimons v. PNC Bank, N.A.</u>,

254 Fed. Appx. 896, 898 (3d Cir. 2007) (nonprecedential) (citing <u>Fuentes</u>, 32 F.3d at 764); <u>see also</u> <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005) (plaintiff's rebuttal evidence "must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action") (quoting <u>Fuentes</u>, 32 F.3d at 764).

To meet the step three (3) evidentiary burden, at a minimum, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[9] <u>Fuentes</u>, 32 F.3d at 764. One of these is sufficient; the employee does not have to prove both that the explanation is implausible and that discrimination was a motivating factor. <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 494-95 (3d Cir. 1995). Where the plaintiff offers evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail." <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 166 (3d Cir. 1999).

At the same time, however, the plaintiff:

> must do more than show that [the employer] was "wrong or mistaken" in deciding to lay him off. He must "present evidence contradicting the <u>core facts</u> put forward by the employer as the legitimate reason for its decision."

<u>Tomasso</u>, 445 F.3d at 706 (emphasis in original) (quoting <u>Kautz</u>, 412 F.3d at 467) (internal

---

[9]      For example, "the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 645 (3d Cir. 1998) (citing <u>Fuentes</u>, 32 F.3d at 765).

citation omitted).  The plaintiff's evidence must be sufficient to convince a reasonable factfinder

"not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that

it cannot have been the employer's real reason."  Keller, 130 F.3d at 1109.  The plaintiff's

evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them 'unworthy of credence,' and hence infer that the 'employer

did not act for [the asserted] non-discriminatory reasons.'"  Fuentes, 32 F.3d at 765 (internal

citations omitted) (quoting other cases).

That a plaintiff has established a prima facie case and then gone on to produce some step

three (3) evidence in an attempt to contradict an employer's stated rationale for its action does

not necessarily or automatically lead to a determination that the plaintiff has succeeded in

establishing a triable issue of fact with respect to discriminatory motive. See, e.g., Reeves v.

Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000) ("[c]ertainly,

there will be instances where, although the plaintiff has established a prima facie case and set

forth sufficient evidence to reject the defendants's explanation, no rational factfinder could

conclude that the action was discriminatory").  If the contradictory evidence is "weak," Reeves,

530 U.S. at 148, 120 S.Ct. at 2109, and does not permit the inference that the articulated reason

for the adverse action was pretextual, the plaintiff may need to satisfy the ultimate burden of

proof through some additional evidence of a discriminatory intent.   On the other hand, where a

plaintiff produces evidence that contrasts markedly with the employer's stated rationale for its

employment action, those contradictions may well be so stark as to be sufficient, alone, to create

a triable issue of material fact and to permit a reasonable factfinder to infer a discriminatory

motive.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749 (1993)

("[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief

is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie

case, suffice to show intentional discrimination" without additional proof of discrimination).


### 4.

Throughout this burden shifting process, "the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff." Reeves, 530 U.S. at 143, 120 S. Ct. at 2106 (quoting Tex. Dep't of Cmty. Affairs

v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (U.S. 1981)); Barber v. CSX Distrib.

Servs., 68 F.3d 694, 698 (3d Cir.1995); accord Marra v. Philadelphia Hous. Auth., 497 F.3d 286,

300 n.11 (3d Cir. 2007).


### 5.

In applying the burden shifting principles set forth above, I am mindful of the procedural

posture of this proceeding.  We are at summary judgment.  At summary judgment, the

nonmoving party (here, the Debtor) is entitled to all reasonable inferences that may be drawn

from the record and it is not the court's function to weigh the evidence.

As explained below, the Debtor has produced some evidence challenging the Knights

Defendants' explanation for his termination.  In this setting, the Knights Defendants' Motion for

Summary Judgment can be granted only if I conclude that the Debtor's evidence is insufficient as

a matter of law to permit a reasonable factfinder to conclude that the Knights' explanation is

unworthy of credence and therefore, is a post hoc fabrication or pretext.  See Sheridan v. E.I. Du Pont de Nemours Co., 100 F.3d 1061, 1071-72 (3d Cir. 1996) (en banc).

Whether a plaintiff's evidence of pretext is sufficient to defeat a motion for summary judgment is an issue that arises frequently in employment discrimination cases.  There reported cases on the issue are legion.  In the note below, I have cited a representative sampling of the appellate decisions in this Circuit.[10]  At a minimum, the cautionary principle that may be drawn from the case law is that there may be a fine line between (improperly) weighing the plaintiff's pretext evidence on summary judgment and determining that the evidence is insufficient as a

---

[10]    Compare Williams v. Dover Downs, Inc., 2008 WL 2879795 (3d Cir. 2008) (nonprecedential) (employer's inconsistent explanations for dismissal insufficient to permit reasonable factfinder to find employer's explanation offered in court  unworthy of credence); Dooley v. Roche Lab Inc., 275 Fed Appx. 162 (3d Cir. 2008) (nonprecedential) ("irregularities" in hiring process combined with "raw numerical comparisons" held insufficient to overcome employer's explanation at summary judgment stage); English v. PNC Bank, 221 Fed. Appx. 105 (3d Cir. 2007) (nonprecedential) (evidence of inconsistency in employer's discipline of employees who committed infractions similar to the plaintiff merely cast doubt on proportionality of punishment and did not demonstrate illegal motive); Marione v. Metro. Life Ins. Co., 188 Fed. Appx. 141 (3d Cir. 2006) (nonprecedential) (evidence that younger, lower ranked employees were retained insufficient to defeat summary judgment on pretext issue in light of employer's explanations for retention of the other employees); Harding v. Careerbuilder, LLC, 168 Fed. Appx. 535 (3d Cir. 2006) (nonprecedential) (evidence that younger employer had worse quantitative sales performance before replacing plaintiff insufficient to defeat summary judgment on pretext issue because evidence did not reflect comparative revenue performance and comparability of replacement's prior position); Kautz, 412 F.3d at 469-73 (2-1 decision) (plaintiff's challenge to methodology employed to evaluate performance and argument that it was skewed against older employees insufficient to defeat summary judgment on pretext issue);  Simpson, 142 F.3d at 647-49 (evidence of more favorable treatment received by one employee and challenge to methodology employed to evaluate performance insufficient to defeat summary judgment on pretext issue), with Williams v. St. Joan of Arc Church, 226 Fed. Appx. 180 (3d Cir. 2007) (2-1 decision) (nonprecedential) (employer's comments regarding the plaintiff's age and conflicting evidence regarding need to consolidate office positions sufficient to permit finding of pretext and defeat summary judgment); Tomasso, 445 F.3d at 707-709 (2-1 decision) (plaintiff's dispute of facts underlying negative review leading to layoff sufficient to permit finding of pretext and defeat summary judgment); Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005) (2-1 decision) (same as Tomasso); Benjamin v. E.I. Du Pont de Nemours and Co., 75 Fed. Appx. 65 (3d Cir. 2003) (nonprecedential) (plaintiff's positive performance reviews that contradicted the proffered basis for employer's adverse action was sufficient to permit a finding of pretext and defeat summary judgment). This is intended to be an illustrative compilation, not a comprehensive one.

matter of law to permit a reasonable factfinder to draw an inference that the employer's

explanation for its conduct was a post hoc fabrication or pretext.

      With the foregoing principles in mind, I next evaluate the Knights' Summary Judgment

Motion and the Debtor's opposition thereto.


**B.    Reconsideration of the Prior Determination that the Debtor Failed to Produce
Sufficient Evidence to Create A Triable Issue of Fact With Respect to the 4th Prong of
the Step 1 prima facie Test**

**1.**

      In June 1995, the Knights entered into a contact with the Debtor, through which the

Knights authorized the Debtor to sell its insurance products to members of five (5) Knights of

Columbus "councils."  Under the contract, the Debtor acted as a "field agent" for the Knights, a

position he maintains made him a Knights "employee."  In late 2005 or early 2006 (the parties

dispute the date), the Knights terminated its contract with the Debtor.

      The Debtor asserts that the Knights terminated his employment because of his age.  He

claims that the Knights Defendants first reduced his territory or interfered with his efforts to

write insurance policies for customers, thereby lowering his production to justify the action he

says they later took  –  replacing him with younger, less experienced agents who would not object

to what the Debtor claims are the Defendants' illegal sales activities.  See Compl., Adv. No.

07-52, Count I.[11]

---

[11]    The Debtor also asserted that he was terminated to reduce his pension rights.  In the
March 17, 2008 bench opinion on summary judgment, I concluded that the latter theory was preempted
by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001 et seq.
See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111 S. Ct. 478 (1990); Wood v. Prudential Ins. Co.
of Amer., 207 F.3d 674 (3d Cir. 2000).

The Knights Defendants contend that the Debtor was terminated for poor job performance, specifically, the Debtor's failure "to produce an acceptable volume of business to justify continuance of his contract."  Adv. No. 07-60, Docket Entry No. 118, (Exhibit 48 to Knights' Motion for Summary Judgment).[12]

## 2.

In this proceeding, the Debtor has invoked the "indirect evidence" approach, requiring the application of the <u>McDonnell Douglas</u> Analysis.  The Debtor contends that he has made out a <u>prima facie</u> case because: (1) in November 2005, he was 56 years old and therefore within the protected class under the ADEA; (2) he was terminated from employment by the Knights; (3) he was qualified for his position as field agent, as evidenced by his having held the position for more than ten (10) years; and (4) he was replaced by Thomas Jenkins, an individual he contends was sufficiently younger to create an inference of discrimination.[13]

In their Motion for Summary Judgment, the Knights Defendants assert, as a threshold matter, that they are entitled to summary judgment because the record conclusively demonstrates

---

[12]    Hereafter, I will use the term the "Knights Exhibit," when I refer to an exhibit the Knights Defendants submitted in support of their Motion for Summary Judgment.

[13]    In his Memorandum in response to the Knights Defendants' Motion for Summary Judgment, the Debtor also claimed he was replaced by two (2) other individuals: William Shaffer and Bruce Micciulla.  <u>See</u> Debtor's Brief in Opp. at 12.  The Knights Defendants dispute that the age difference between the Debtor and Shaffer is sufficient to create an inference of discrimination.  They also dispute that there is any evidence that Micciulla replaced the Debtor or assumed his responsibilities. Because I find that the Debtor has produced sufficient evidence to defeat the Knights Defendants' Motion for Summary Judgment as to step 1 of the <u>McDonnell Douglas</u> Analysis based on the evidence regarding the age difference between the Debtor and Jenkins, <u>see</u> text, <u>infra</u>, I need not resolve the issues relating to Shaffer and Micciulla.

that the Debtor was an independent contractor, not an employee and therefore was not covered by

the ADEA.  Further, the Knights Defendants assert that they are entitled to judgment because the

Debtor lacks evidence with respect to at least two (2) of the four (4) prongs of the step 1 test for a

prima facie case under the ADEA.  Specifically, they contend that summary judgment record

establishes that the Debtor: (1) was not qualified for the field agent position; and (2) was not

replaced by someone sufficiently younger to create an inference of age discrimination.

On March 17, 2008, I granted the Knights Defendants' Motion for Summary Judgment on

the ADEA claim because I concluded that the Debtor had not established a prima facie case.  In

my bench opinion, I based the decision on only one ground: that the Debtor had not produced

sufficient evidence at the summary judgment stage to create a triable issue of fact as to whether

he was replaced by an individual sufficiently younger in age to create an inference of

discrimination (i.e., the fourth prong of the established test for a prima facie case under step 1 of

the McDonnell Douglas Analysis).  This made it unnecessary to consider the Knights

Defendants' other arguments.

In evaluating whether the Debtor satisfied the fourth prong of the prima facie test, I found

that the age difference between the Debtor and Jenkins was only seven (7) years.  I then reasoned

that, absent some other evidence of age-based discrimination, the seven (7) year age difference

was insufficient to create an inference of discrimination.  See Mock v. Univ. of Pittsburgh, 2007

WL 2253602, at *12 (W.D. Pa.  Aug. 3, 2007) (no prima facie case made out based on seven (7)

year age difference in absence of additional evidence of discrimination).

**3.**

My initial decision regarding the fourth prong under step 1 of the McDonnell Douglas

Analysis was based on a faulty factual premise.  The age difference between the Debtor and

Jenkins is eight (8) years and four (4) months,[14] not seven (7) years.[15]

After the Debtor pointed out this mistake in his motion for reconsideration, I concluded

that it was appropriate to reconsider the issue:

> [w]hile one (1) additional year is not a large difference, it makes the issue
> sufficiently closer to warrant further review.  Compare Angelico v. Agilent
> Technologies, 2006 WL 2854377 (E.D. Pa. Oct. 3, 2006) (7 year age difference
> between 53 year old plaintiff and 46 year old replacement insufficient to create
> inference of age discrimination) (citing Narin v. Lower Merion Sch. Dist., 206
> F.3d 323 (3d Cir. 2000) (same result in case involving comparison of 56 year old
> plaintiff to 49 year old employee) with Tarshis v. Riese Organization, 211 F.3d
> 30, 38 (2d Cir. 2000) (inference of age discrimination found in case involving 8
> year difference between 67 year old plaintiff and 59 year old replacement).

Order dated June 3, 2008, at n.2 (Adv. No. 07-060, Docket Entry No. 287).

Upon reconsideration, I find that the Debtor has produced evidence sufficient to permit a

reasonable factfinder to find that the Debtor was replaced by a sufficiently younger person to

support an inference of discrimination.  I reach this result for two (2) reasons.

First, I am guided by the Court of Appeals' instruction that the task of establishing a

prima facie case under the ADEA is not intended to be onerous.  Sempier v. Johnson & Higgins,

45 F.3d 724, 728 (3d Cir. 1995); accord Rouse v. II-VI Inc., 2008 WL 2914796, at *12 (W.D. Pa.

---

[14]    The Debtor's birth date is March 10, 1949.  Jenkins' birth date is July 15, 1957.  See
Knights Exhibit 43.

[15]    In their submissions to the court, the Knights Defendants made the same arithmetic error,
not once but twice.  See Knights Memo of Law in Support of Motion for Summary Judgment at 74
(referring to the Debtor and Jenkins as having a "minimal age difference of seven years and four
months") (emphasis added) (Adv. No. 07-060, Docket Entry No. 110); Knights Reply Memorandum in
Support of Motion for Summary Judgment at 16 (Adv. No. 07-060, Docket Entry No. 161).

July 24, 2008).  Indeed, the consequence of making out a <u>prima facie</u> case is simply that it shifts the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action it took.  To the extent there may be any uncertainty as to the adequacy of the age difference, I will give the Debtor the benefit of the doubt.

Second, I am influenced by my review of <u>Barber v. CXS Distribution Services</u>, 68 F.3d at 699, a case not cited by any party until after entry of the March 17, 2008 Order granting the Knights Defendants' Motion for Summary Judgment.  In <u>Barber</u>, the Court of Appeals of this Circuit found that an eight (8) year age difference made out a <u>prima facie</u> case:

> That difference, together with the undisputed existence of the remaining elements of [the plaintiff's] <u>prima facie</u> case, were clearly sufficient to shift the burden of production to the defendants and require them to articulate a legitimate, nondiscriminatory motivation for their failure to promote Barber.

<u>Id.</u> at 699.


**C.    The Debtor Has Produced Sufficient Evidence to Create A Triable Issue of Fact With Respect to the Remaining Prongs of the <u>prima facie</u> Test**

Having found the age difference between the Debtor and Jenkins sufficient to permit a factfinder to make an inference of discrimination at trial, I must now consider the Knights Defendants' two (2) other arguments that I did not reach in my earlier decision: (1) that the Debtor may not maintain an ADEA action because he was not a Knights employee and (2) that the Debtor was not qualified to be a Knights field agent.  Bearing in mind that on summary judgment, the Debtor's burden is to present evidence that would support a finding in his favor on these issues at trial, I conclude that the Debtor has presented sufficient evidence to preclude summary judgment.

**1.**

"The ADEA protects only individuals who are 'employees.'"  <u>Cox v. Master Lock Co.</u>,

815 F.Supp. 844, 845 (E.D. Pa. 1993) (citing <u>EEOC v. Zippo Mfg. Co.</u>, 713 F.2d 32, 33 (3d Cir.

1983), <u>aff'd</u>, 14 F.3d. 46 (3d Cir. 1993) (Table), <u>overruled on other grounds</u> by <u>Nationwide Mut.</u>

<u>Ins. Co. v. Darden</u>, 503 U.S. 318, 112 S. Ct. 1344 (1992)).  However, the ADEA does not define

the term "employee."  It states only that an employee is "an individual employed by any

employer."  29 U.S.C. §630(f).

In <u>Darden</u>, a case decided under ERISA (another federal statute that does not define the

term "employee"), the Supreme Court held that courts should determine who qualifies as an

"employee" by applying the common law of agency.  503 U.S. at 322-323, 112 S. Ct. at 1348.

This requires consideration of several factors:

1.  the hiring party's right to control the manner and means by which the work
    is accomplished;

2.  the skill required;

3.  the source of the instrumentalities and tools;

4.  the location of the work;

5.  the duration of the relationship of the parties;

6.  whether the hiring party has the right to assign additional projects to the
    hired
    party;

7.  the extent of the hired party's discretion over when and how long to work;

8.  the method of payment;

9.  the hired party's role in hiring and paying assistants;

10. whether the work is part of the regular business of the hiring party;

11.    whether the hiring party is in business;

12.    the provision of employee benefits; and

13.    the tax treatment of the hired party.

Id. at 323-24, 112 S. Ct. at 1348.  Courts have employed the Darden test to determine whether an

ADEA plaintiff was an employee.  See Alba v. Housing Auth., 400 F.Supp. 2d 685, 693 (M.D.

Pa. 2005); Cox, 815 F.Supp. at 846.

In their Motion for Summary Judgment, the Knights Defendants assert that the Debtor

was not an employee because the parties' contract states that he was an independent contractor.

The Knights Defendants refer to the following provision in the contract:

> Nothing contained in this Agreement shall be construed to create the relationship
> of employer and employee between the [Knights] and the Field Agent, between
> the [Knights] and the General Agent, or between the General Agent and the Field
> Agent.

Knights Exhibit 2, at ¶4.

The Knights Defendants argue that the Debtor has no evidence to refute his status as an

independent contractor and that record "is replete" with evidence establishing that the Debtor

was an independent contractor.  Knights Memo of Law in Support of Motion for Summary

Judgment, at 72.[16]

---

[16]    The Knights Defendants also suggest I need look no further than ¶4 of the parties'
contract to find that the Debtor was an independent contractor.  They rely on Cahill v. State Farm Mut.
Auto. Ins. Co., 2001 WL 515926, at *2 (E.D. Pa. May 14, 2001) for the legal proposition that, where the
relevant documentation clearly illustrates that a plaintiff was an independent contractor, the court need
not apply the Darden factors.  Knights Memo of Law in Support of Motion for Summary Judgment, at 72
n.47.  I do not read Cahill so broadly.  In that case, which also involved an insurance agent, the plaintiff
did not allege in his complaint that he was employee.  Also, he conceded at his deposition that he was not
an employee and that the parties' intent in entering into their contract was to make him an independent
contractor.  Here, in both adversary complaints, the Debtor regularly refers to the parties' contract as an
employment contract and has never conceded that he was an independent contractor.

I disagree with the Knights Defendants' characterization of the record. I find that there is evidence in the record, some of it in the parties' contract itself, that is sufficient to create a genuine issue of material fact concerning the Debtor's status as a Knights employee. Specifically, I refer to: (1) the requirement that the Debtor "devote his full time and entire energy and attention" to selling the Knights' insurance products exclusively and that the Debtor engage in no other "occupation or business";[17] (2) the Knights' provision of health and welfare benefits to the Debtor; (3) the parties' longstanding relationship.

At this stage, it is unnecessary to review comprehensively the evidence, pro and con, as to whether the Debtor was a Knights employee or an independent contractor. The court's role is limited to deciding whether there is sufficient evidence to permit a reasonable factfinder to conclude that the Debtor was a Knights employee and therefore, within the class of individuals entitled to invoke the remedies made available under the ADEA. I am satisfied that the Debtor has met that burden. See Jenkins v. Southern Farm Bureau Cas., 307 F.3d 741 (8th Cir. 2002); Battistone v. Sam Jon Corp., 2002 WL 32345692 (E.D. Pa. Oct. 4, 2002).

**2.**

---

I am aware that a number of courts have found insurance agents to be independent contractors and not employees. E.g., Weary v. Cochran, 377 F.3d 522 (6th Cir. 2004) (2-1 decision); Barnhart v. New York Life Ins. Co., 141 F.3d 1310 (9th Cir. 1998); United States EEOC v. Catholic Knights Ins. Soc., 915 F.Supp. 25 (N.D. Ill. 1996). However, those determinations were factual ones based on the record made in those cases and not a determination, as a matter of law, that an insurance agent cannot be an employee.

Finally, I observe that the plaintiff in Darden was an insurance agent.

[17]     See Knights Exhibit 2, at ¶5(a).

The Knights Defendants' argument that the Debtor was not qualified to be a field agent need not detain me long.  The Knights Defendants contend that the Debtor was not qualified because he breached his contractual obligation to work exclusively for the Knights:

> During his tenure with the Knights, Plaintiff sold insurance policies for other insurance companies, and sold many of those policies to members of the Knights and their families. Certainly, this behavior is contrary to that which is expected of a "qualified" field agent, both pursuant to the Field Agent Contract and in accordance with common sense.

Knights Memo of Law in Support of Motion for Summary Judgment at 73.

I fail to see how the Debtor's alleged breach of his promise to work exclusively for the Knights made him "unqualified" to work in the position that he held for more than ten (10) years. The argument improperly conflates the concepts of job qualification and breach of contract. Given the principle that all reasonable inferences from the record should be made in favor of the nonmoving party, the Debtor's lengthy tenure as a Knights field agent is some evidence that he was qualified for the position.  See Sempier, 45 F.3d at 729; see also Makky v. Chertoff, 2008 WL 3091785, *9 (3d Cir. Aug. 7, 2008) (issue of job qualification "involves inquiry only into the bare minimum requirement necessary to perform the job at issue").  The Knights have come forward with no evidence to contradict that factual inference (other than the "breach of contract" theory that I reject).  Therefore, the Knights have not established the absence of a disputed triable issue of fact issue regarding the Debtor's qualifications for the field agent position.

**3.**

The above discussion demonstrates that the Debtor has come forward with evidence to

create triable issues of fact with respect to all four (4) prongs of the prima facie test under step 1

of the "indirect method" of proving age discrimination under the ADEA (i.e., the McDonnell

Douglas Analysis). There is competent evidence that: (1) the Debtor is in the protected class; (2)

he was terminated from "employment" as a field agent, (3) that he was qualified for the position

and (4) he was replaced by a sufficiently younger person to create an inference of age

discrimination. Therefore, I reach step 2 in the analysis and next consider whether the Knights

Defendants have articulated a legitimate, nondiscriminatory reason for terminating the Debtor's

status as a field agent.

**D.  The Knights Defendants Have Satisfied Their Step 2 Burden of Producing Evidence in Support of the Articulated Nondiscriminatory Reason for their Employment Action**

**1.**

In Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981),

the Supreme Court described the defendant's burden in step 2 as follows:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone
> else was preferred, for a legitimate, nondiscriminatory reason. The defendant need
> not persuade the court that it was actually motivated by the proffered reasons.  It is
> sufficient if the defendant's evidence raises a genuine issue of fact as to whether it
> discriminated against the plaintiff.  To accomplish this, the defendant must clearly
> set forth, through the introduction of admissible evidence, the reasons for the
> plaintiff's rejection.  The explanation provided must be legally sufficient to justify
> a judgment for the defendant.

450 U.S. at 254-255, 101 S. Ct. at 1094 (footnote and citation omitted) (emphasis added).  The

Court added that "[a]n articulation not admitted into evidence will not suffice.  Thus, the

defendant cannot meet its burden merely through an answer to the complaint or by argument of

counsel."  450 U.S. at 255 n.9, 101 S. Ct. at 1095 n.9.

The Knights Defendants contend that they terminated the Debtor's field agent contract due to poor job performance. Specifically, they assert that the Debtor failed "to produce an acceptable volume of business." Knights Exhibit 48. In support of this assertion, the Knights Defendants submitted:

1.  the affidavit of Thomas Smith, Executive Vice President of Agencies and Marketing for the Knights, in which Mr. Smith states that "[f]or five of the last 6 years that [the Debtor] was a Field Agent, his insurance sales were substandard," that his "application count was consistently low and he seldom earned enough first year commission to maintain minimum commission standards." See Knights Exhibit 29 (Declaration of Thomas Smith ¶4);

2.  five (5) letters from the Debtor to Knights representatives, sent intemittently between sometime in 2000 and January 31, 2005, the majority of which appear to have been sent by the Debtor to explain the reasons why, despite his failure to meet undescribed sales standards, the Knights should not reduce his benefits or expense allowances. See Knights Exhibit 30;

3.  a document titled "Field Agents Recorded Business Report Year-To-Date as of 12-31-05," which ranked the Debtor at 1,181 on a listing of 1,237 agents. See Knights Exhibit 32; see also Knights Exhibit 33 (document titled "Field Agents Recorded Business Statistics Year to Date as of 12-31-05," which ranked the Debtor at 1,129 on the listing of 1,237 agents); and

4.  a document titled "Council Addition or Deletion" bearing the effective date of 5/1/05 that purports to delete councils 345, 2522, 4050,4282, 4754 representing 664 members from the Debtor's territory "due to unacceptable production from agent T. Olick." See Knights Exhibit 44.

Based on the evidence referenced above, I conclude that the evidence the Knights Defendants submitted satisfies its minimal evidentiary burden in step 2 of the McDonnell Douglas Analysis. The evidence is sufficient to permit a reasonable factfinder to conclude that the Debtor's termination was based on a legitimate nondiscriminatory reason, here, the Debtor's alleged poor job performance.

**2.**

Before proceeding to consider step 3 of the <u>McDonnell Douglas</u> Analysis (the Debtor's

evidence of pretext), I pause to make an observation regarding the evidence that the Knights

offered.

The Notice of Intent to Terminate dated September 8, 2005, <u>see</u> Knights Exhibit 48,

stated that the Debtor "failed to produce an acceptable volume of business" and also stated that

the Debtor "has been previously made aware of the standards that exist in the Agency, and has

not responded" (the reference to the Debtor's "lack of response" presumably referring to his

failure to improve his performance).

In light of this explanation for its decision to terminate the Debtor as a field agent, the

evidence that the supporting evidence that the Knights Defendants produced seems

conspicuously anemic.  The Knights did not produce any written policy statements establishing

objective performance standards or sales data for its field agents for the period prior to

September 8, 2005.[18]  Nor did they produce any written "warnings" given to the Debtor prior to

---

[18]    I mention this not because the Knights Defendants were obliged to produce such
evidence to satisfy the step 2 burden, but because one would reasonably expect that Knights
management would consider such information in making the decision to terminate the Debtor as a
field agent and this type of evidence is within their control to produce.  While the Knights
Defendants did submit some evidence of this nature in the form of Exhibits 32 and 33, those
Exhibits were deeply flawed, at least in the manner in which they were presented in support of
the Motion for Summary Judgment.

Exhibits 32 and 33 are reports that purport to rank the performance of Knights field
agents on a nationwide basis.  Both of the reports post-date the September 8, 2005 Notice of
Intent To Terminate (Knights Exhibit 48).  The initial steps in the process leading to the
Knights' adverse action at issue must have taken place prior to September 8, 2005.  Therefore, at
least some of the data in the reports (<u>i.e.</u>, the data relating to sales from September 8, 2005 to
December 31, 2005) could not have played any role in the Knights Defendants' decision to
terminate the Debtor.  Further, the reports are not accompanied by a supporting affidavit that
explains, <u>inter alia</u>, (1) the meaning of the terms used (e.g., "net premium," "gross volume,"
"net volume," equalizer, "quota") data; (2) how the Knights Defendants used the data; and (3)
the rationale of the ranking system.  These inadequacies rob Exhibits 32 and 33 of

September 8, 2005 regarding his alleged poor production or deposition testimony or affidavits concerning verbal warnings given to the Debtor.[19]

In short, while the evidence the Knights Defendants produced sufficed to satisfy the minimal burden of production set forth in Burdine, the evidence was all indirect and circumstantial.[20]

## E.    The Debtor Has Not Met His Step 3 Burden

### 1.

I now reach the crux of the matter.  As in many employment discrimination cases, the real battleground is step 3 of the McDonnell Douglas Analysis.

As stated in Part III.A.3 above, to defeat a summary judgment motion, a plaintiff who has made a prima facie showing of discrimination must point to evidence that is sufficient to create a triable issue of material fact concerning whether:  (1) the employer's proffered explanation is

---

much of their probative value.

[19]    The Knights Defendants directed my attention to Mr. Olick's December 21, 2006 Deposition at 259, 12-24 (Knights Exhibit 1).  They contend that the Debtor conceded that Mr. Kearney had spoken to him about his "poor production."  However, on the referenced page the Debtor asserts that the Notice of Intent to Terminate came "out of the blue."  Id. at line 7.  The Debtor states that Mr. Kearney told him that "it's nice that you are selling a lot of insurance, but you're not producing enough policies."  Id. at lines 18-22.   The Debtor contended that his production was "within the Knights' of Columbus guidelines," that Mr. Kearney accepted that answer, and that the Debtor assumed "it was good."  Id. at 260, 1-7.

[20]    This is exemplified by the five (5) letters comprising Knights Exhibit 30.  It is possible to infer from the letters, which were sent in 2000, 2001, 2002, 2003 and 2004 respectively, that there were chronic "issues" regarding the sufficiency of the Debtor's sales output.  Yet, the specific contents of the letters were the Debtor's asserted justifications for what he would characterize as mere apparent shortfalls in his performance.

worthy of credence; or (2) an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action.  <u>Fuentes,</u> 32 F.3d at 764.

I have carefully reviewed the Debtor's four (4) memoranda and the evidence he has

marshaled in opposition to the Knights Defendants' Motion for Summary Judgment and in

support of a pretext argument under step three (3) of the <u>McDonnell Douglas</u> Analysis.[21]  Based

on that review, I conclude that the Debtor has not produced adequate evidence to permit a

reasonable factfinder to discredit the core facts underlying the Knights Defendants' articulated

rationale for the adverse action: poor production over an extended period of time.  He has not

proffered sufficient evidence to demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions," <u>see</u> Fuentes, 32 F.3d at 765, in the Knights Defendants'

explanation of its action to permit a reasonable factfinder to find them unworthy of credence and

justify an inference that the Defendants acted for unlawful discriminatory reasons.

---

[21]     All together, the Debtor had four (4) opportunities to argue that his ADEA claim should
survive summary judgment: (1) his initial response to the Knights Defendants' motion for summary
judgment, filed October 9, 2007 ("the Debtor's Initial MSJ Response"), <u>see</u> Adv. No. 07-060, Docket
Entry No. 157; (2) what he titled a "Sur Reply" to the Motion for Summary Judgment, filed November 8,
2007 ("the Debtor's Supplemental MSJ Response"), <u>see</u> Adv. No. 07-060, Docket Entry No. 186; (3) an
initial memorandum authorized by the court's reconsideration order of June 3, 2008, filed on June 25,
2008 ("the Debtor's Initial Reconsideration Memo"), <u>see</u> Adv. No. 07-060, Docket Entry No. 297; and
(4) a second memorandum (titled "Supplemental Brief in Support of an Inference of Age
Discrimination"), as authorized by the court's Order of July 7, 2008 and filed on August 12, 2008 ("the
Debtor's Second Reconsideration Memo"), <u>see</u> Adv. No. 07-060, Docket Entry No. 320.

        I note that by Order dated December 20, 2007 on the Knights' Defendants Motion to
Strike the Debtor's Supplemental MSJ Response, I ruled that the documents that the Debtor attached to
that supplemental response as exhibits 20, 21, 24 and 26 and the first page of exhibit 25 were stricken
and would not be considered part of the record on the Knights Defendants' summary judgment motion.
<u>See</u> Order, Adv. No. 07-060, Docket Entry No. 224.

**2.**

To contradict the Knights Defendants' contention that his production was sub-par, the

Debtor produced:

1. a Knights Field Agents Recorded Business Report dated February 29, 1996)
   ("the Feb. 1996 Report") (similar to the reports referred to in n.18, <u>supra</u>).  <u>See</u>
   Exhibit 21 to Debtor's Second Reconsideration Memo. The Feb. 1996 Report
   appears to rank the Debtor first nationally among Knights field agents.

2. a Knights Field Agents Recorded Business Report dated December 31, 2001
   ("the Dec. 2001 Report").  <u>See</u> Exhibit 15 to Debtor's Second Reconsideration
   Memo. The Dec. 2001 Report appears to rank the Debtor 461st nationally
   among 1,126 Knights field agents.

3. a document titled "Field Agents Recorded Business Report Year-To-Date as
   of 2/28/03" ("the Feb. 2003 Report").  <u>See</u> Exhibit 3 to Debtor's Second
   Reconsideration Memo.  The Feb. 2003 Report appears to rank the Debtor
   fourth nationally among Knights field agents.  It also includes a handwritten
   notation dated "3/5," stating "Tom – Great work.  Keep it up - I'm proud of
   you" signed by "Bob O'K."[22]

4. a series of three (3) documents that appear related to each other by virtue of
   their subject matter, the Debtor's termination.

   a. The first is a handwritten memo addressed to, <u>inter alia</u>, B. O'Keefe.
      The handwriting in the first paragraph is difficult for me to decipher.
      The part I can decipher says, "Need . . . explanation from GA."  The
      second paragraph appears to read: "What happens when we fwd T.O.[23]
      a copy of a termination dated 11/1 on 2/17?"  <u>See</u> Exhibit 5 to
      Debtor's Second Reconsideration Memorandum.

   b. The next document purports to be an email from Robert O'Keefe to

---

[22]        "Bob O'K" appears to be Bob O'Keefe, an individual who bears the title "Agency Vice
President."  <u>See</u> Exhibit 6 to Debtor's Second Reconsideration Memo; <u>see also</u> Knights Exhibit 46.  Mr.
O'Keefe's precise role in the Knights' hierarchy has not been explained, but it is obvious that he has
managerial authority of some sort.

[23]        "T.O." presumably refers to Thomas Olick, the Debtor.

James Kearney, dated 2/17/06 with the subject "Olick Termination."[24]
See Exhibit 6 to Debtor's Second Reconsideration Memorandum.

c.   The third document purports to be an email from DJKMAG@aol.com
to Robert O'Keefe dated 2/22/06.[25] See Exhibit 7 to Debtor's Second

---

[24]      It states:

I need from you in writing a full and complete explanation on
the circumstances leading up to Mr. Olick's termination.  In
preparing this, consider the following questions:

1.  If he was, as you said yesterday, gone Nov. 1, why did you wait
till January to terminate him?
2.  How should we interpret your January 1 termination if he was
really gone in November?  Was it not truthful?
3.  What do you think will happen when Olick receives a copy of a
termination effective Nov. 1 which is sent out from here Feb. 17?

These are just a few things to address.  You should obviously make
reference to any other aspects surrounding the matter.  Make sure
your explanation of the circumstances surrounding Mr. Olick's
departure are full, complete and truthful. This is a very serious
matter, Jim, what with a law suit hanging over our heads.  I'm
counting on you to treat it that way.

Let me hear from you ASAP but no later than Wed., 2/22/06.

See Exhibit 6 to Debtor's Second Reconsideration Memo.

[25]      It states:

Bob, answers to your Feb. 17th emails on the Olick termination
are as follows: (1) I did not say Olick was gone Nov. 1st, Jim
Lee informed me during our conversation that Olick resigned
Nov. 1st, which I have no documentation on that subject, (2)
I terminated Olick Jan. 1st 2006 as not to have any low
producers of his nature into 2006.  When I found out from the
Agency Dept. that Olick resigned in Nov. 2005 [as per Jim Lee],
I thought it would be appropriate to adjust the termination notice
effective Nov. 2005, (3) I do not think anything should happen
since the facts from the Agency Dept. state that Olick resigned,
unknown to myself, Nov. 2005.  The only other aspect that should
be addressed is the fact that Olick should not get one penny from
the KofC.  I would be very pleased to participate in any court
proceedings to prove Olick has no basis in attempting to extort

Reconsideration Memorandum.

This evidence is not sufficiently probative on the issue of pretext to permit the Debtor to survive summary judgment.

Starting with the "Reports" that the Debtor produced to contradict the Knights assertion that his job performance was poor (i.e., documents 1, 2 and 3 above), for several reasons, these Reports do not provide a basis for a reasonable factfinder to conclude that Knights Defendants' explanation for terminating the Debtor was pretextual.

First, the Debtor has failed to put forward any accompanying foundational evidence that would permit a factfinder to understand the meaning of the data or place it in an appropriate context.  See n.18, supra.  For instance, what time period is covered by the reports?  Are they annual reports?  Are the Feb. 2003 and Feb. 1996 Reports interim reports that cover only the first two (2) months of the calendar year?[26]  Aside from the comparative ranking, how are sales standards and goals set and measured? .  How many other field agents are truly "comparable" to the Debtor for purposes of assessing the claim that he was treated differently based on his age?  What adverse actions, if any, were taken against comparable field agents?

Second, viewed individually or collectively, the "Reports" do not plainly refute the representation in the Thomas Smith Declaration (Knights Exhibit 29) that the Debtor's sales

---

money from the KofC.  Fraternally, Jim Kearney.

See Exhibit 7 to Debtor's Second Reconsideration Memo.

[26]    If so, the evidence is of limited probative value on the issue of overall job performance. To employ a sports analogy from baseball, it does not matter if your team is in first place on June 1st. What matters is the team's place in the standings at the end of the season.

performance was substandard for five (5) of the previous six (6) years.  See also n.26, supra.[27]

Moving on to the fourth group of documents (Exhibits 5, 6, and 7 to the Debtor's Second Reconsideration Memorandum), these documents also lack supporting affidavits, deposition testimony or other foundational evidence needed to put them in context.  Exhibit 5, in particular, is not entirely readable.  However, at most, (and without foundational evidence to better explain their meaning), these documents merely appear to  memorialize the confusion that existed within the Knights' management as to the effective date of his separation from the Knights and whether the Debtor was terminated or resigned.  This evidence simply is not inconsistent with the Knights Defendants core position that the Debtor was terminated due to inadequate sales production.

The Debtor's next basis for claiming pretext is grounded in his interpretation of Knights Exhibit 32, which is a "Field Agents Recorded Business Report as of December 31, 2005" ("the Dec. 2005 Report").  The Knights Defendants point to the Dec. 2005 Report to support its contention that the Debtor's work was sub-par because the report ranked the Debtor 1,181st out 1,231 field agents nationally.  I have already found the Dec. 2005 Report to be of limited utility.  See n.18 supra.  In any event, the Debtor responds to it by pointing out that it also showed that: (1) on a national basis, less than 10% of the field agents met their quotas in 2005 and (2) only one (1) of the fourteen (14) agents in the Debtor's cohort (i.e., those working in Defendant Kearney's agency) met their quotas in 2004 and only five (5) of the fourteen (14) produced enough business to qualify for additional benefits from the Knights.  The Debtor contends that

---

[27]     In addition to the flaws described in the text above, I consider the Debtor's proffered evidence concerning his job performance as of February 1996 (i.e., document 1 above), almost ten years before the Knights sent the Debtor the Notice to Terminate, far too remote in time from the relevant events to have any probative value to a reasonable factfinder.

"using the criteria stated in [Thomas] Smith's declaration,[28] 10 out of 14 agents working for Kearney should have been terminated."  Debtor's Initial MSJ Response at 14.

       The Debtor's suggestion that the Dec. 2005 Report and Smith Declaration, taken together, demonstrate that he was treated differently than comparable employees, thereby creating the inference that he was victimized by unlawful age discrimination, imbues the Dec. 2005 Report with far more meaning than a rational factfinder may accord it.  First, as stated earlier, the meaning of the document is obscure.  See n.18 supra.  Additionally, there is nothing in the record regarding whether any of the field agents on the Dec. 2005 Report (either inside or outside the Kearney agency) with the Debtor's sales rank or lower were retained or terminated by the Knights, their ages, their length of service, their production levels over time (as opposed to in 2005 alone) or the number, size and nature of their assigned territories.  See Evans v. Pa. Power & Light Co., 98 Fed. Appx. 151, 156 (3d Cir. 2004) (nonprecedential).   In short, the Debtor has not placed the limited information that can reasonably be derived from the Report in a context to give it meaning in proving pretext under step 3 of the McDonnell Douglas Analysis.  He has not developed the record, as he must, to meet his burden of showing the "weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" of the Knights Defendants' explanation for his termination, to describe how the Knights set and measure sales standards and goals.[29]

       Finally, the Debtor also bases his pretext argument, in part, on the fact that prior to the

---

[28]      Knights Exhibit 9; see n.12, supra.

[29]      Fuentes, 32 F.3d at 765 (internal citations omitted).

termination of his contract, the Knights reduced the number of "councils" assigned to him, in effect, reducing his sales territory. From the Debtor's perspective, the Knights' action was motivated by an unlawful discriminatory intent, see text accompanying n.11, supra, and also, explains his allegedly poor production, later used as the justification for his termination. The Knights Defendants counter that the Debtor lost these councils due to poor production.

The Debtor's theory with respect to the "councils" issue necessitated the development of the record in the same manner as described above in connection with the Knights Defendants' act of sending the Notice of Intent to Terminate of September 8, 2005. In other words, to defeat summary judgment, the Debtor was obliged to develop evidence that would place the Knights Defendants' conduct in some larger context from which a reasonable factfinder could infer that the Knights Defendants' explanation for reducing his territory (i.e., poor production) was itself a pretext. But again, the Debtor has failed to generate the kind of evidence that would permit a reasonable factfinder to draw an inference at trial that the Knights' conduct was not motivated by the Debtor's poor production.[30] He simply asks the court to accept his interpretation of Knights Defendants' motivation without concrete, supporting evidence. This is inadequate to defeat summary judgment. See, e.g., Howell v. PPL Services Corp., 232 Fed. Appx. 111 (3d Cir. 2007) (affirming grant of summary judgment where district court found that "[t]he evidence produced by the plaintiff consists largely, if not totally, of his own understanding of events").

---

[30]    I recognize that the Knights Defendants' action in removing councils from the Debtor itself may have contributed to his allegedly poor production and thereby made inevitable, or at least substantially contributed to, the subsequent termination decision. But that is all the more reason why the Debtor was obliged to develop the record to contradict the reasons given by the Knights Defendants for taking the councils from the Debtor in the first place.

**3.**

I recognize that proving discrimination can be a difficult task because, frequently, it is

dependent on circumstantial evidence that must be procured from the adverse party (e.g.,

employment information regarding comparable employees) before it is organized logically to

demonstrate the flaws in the employer's articulated nondiscriminatory justification for its

conduct.  See generally Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1071 (3d Cir.

1996), cert. denied, 521 U.S. 1129, 117 S. Ct. 2532 (1997) ("Cases charging discrimination are

uniquely difficult to prove and often depend upon circumstantial evidence").  Nevertheless, the

Debtor bore the burden of developing a record from which a rational factfinder could find that

the Knights Defendants' reason for his termination was a pretext masking unlawful

discrimination.[31]

In this case, although the evidence presented by the Knights Defendants in support of its

explanation may have been less than compelling (to be generous), the Debtor nonetheless failed

to counter it with evidence sufficient to create a triable issue as to whether the Knights

Defendants' explanation has weaknesses, implausibilities, inconsistencies, incoherencies and

contradictions that make it unworthy of credence.  The entry of summary judgment against the

Debtor's is appropriate because his contention, that the Knights Defendants fabricated their

stated reason for his termination, "is a thesis totally devoid of data to substantiate it."  Kautz, 412

F.3d at 472.

---

[31]    That the Debtor is acting pro se cannot affect the application of the legal principles
discussed above.  While a pro se litigant may be entitled to be treated "gently," he is not entitled to
"special treatment."  Lockhart v. Sullivan, 925 F.2d 214, 216 (7th Cir. 1991).

**V.**

For the reasons set forth above, I conclude that the Knights Defendants are entitled to

summary judgment in their favor on the Debtor's age discrimination claim.  An appropriate

Order will be entered.


**Date:** __October 2, 2008__

_____

**ERIC L. FRANK**

**U.S. BANKRUPTCY JUDGE**


cc:    Thomas W. Olick
       4014 Crestview Avenue
       Easton, PA 18045