### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **THOMAS W. OLICK,** | : | **Chapter 13** |
| | : | |
| **Debtor** | : | |
| | : | **Bky. No. 07-10880ELF** |
| | : | |
| **THOMAS W. OLICK,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **Adv. No. 07-0052ELF** |
| **JAMES KEARNEY, et al.,** | : | |
| | : | |
| **Defendants.** | : | **Adv. No. 07-0060ELF** |
| | : | |

# O P I N I O N

## I.  INTRODUCTION

In 1995, Plaintiff Thomas W. Olick ("Olick") signed a contract with the Knights of Columbus ("the Knights"), a fraternal and charitable institution, to become one of the Knights' field agents selling life insurance policies in Pennsylvania.  After ten (10) years, the relationship soured.  Olick filed four (4) separate lawsuits to remedy what he perceived to be various wrongs the Knights and its employees perpetuated against him.  The above-captioned adversary proceedings, which were consolidated for purposes of pre-trial management and trial, are Olick's two (2) remaining lawsuits.

As originally filed, Olick's adversary complaints contained a total of ten (10) claims and included causes of action asserted under the Employee Retirement Income Security Act of 1974,

1

29 U.S.C. §§1001-1461 ("ERISA"), the Consolidated Omnibus Budget Reconciliation Act, 29

U.S.C. §§1161-1169 ("COBRA"), the Age Discrimination in Employment Act, 29 U.S.C.

§§621-634 ("ADEA"), state employment discrimination statutes and state common law.

Notably, Olick asserted two (2) distinct type of age discrimination claims, i.e., that:

1. the Knights discriminated against him on account of his age by terminating his
   field agent contract; and

2. the Knights retaliated against him by taking adverse action against him after
   learning that he filed the first of his four (4) lawsuits, a lawsuit which raised an
   age discrimination claim.

The original defendants in these adversary proceedings were the Knights, Olick's direct

supervisor (James Kearney ("Kearney")), a co-worker (Thomas Jenkins ("Jenkins")) and Olick's

health insurance carrier (Aetna Life Insurance Co. ("Aetna")).

Prior to trial, Olick settled with Aetna. Resolution of dispositive motions resulted in the

dismissal of Jenkins and most of Olick's claims against the remaining defendants, the Knights

and Kearney.

Left for trial were the following claims against the Knights and Kearney:

1. a COBRA claim against the Knights;

2. an equitable claim under ERISA against the Knights for failing to advise Olick of
   his rights to convert his group life insurance policy to an individual policy and for
   conduct that allegedly precluded Olick from exercising his right to convert the
   policy; and

3. a retaliation claim against the Knights and Kearney under the ADEA, the
   Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§951-963 and
   the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat.
   Ann. §§46a-51- 46a-104.

2

Trial of the consolidated adversary proceedings was held on December 19 and 22, 2008.[1]

Following trial, the parties submitted post-trial memoranda, the last of which was filed on May 4,

2009.

For the reasons that follow, I find that:

1. the Knights violated COBRA by sending Olick a COBRA Notice in which they backdated the "qualifying event;"

2. Olick is entitled to statutory damages for the Knights' COBRA violation;

3. the Knights did not violate ERISA;

4. the Knights did not discriminate against Olick on account of his age by terminating Olick's field agent contract and, therefore, did not violate the ADEA in that regard;

5. the Knights retaliated against Olick in violation of the ADEA by backdating, to Olick's detriment, the effective date of his termination;

6. Olick is entitled to statutory damages for the Knights' violation of the ADEA;

7. under the ADEA, Olick has no claim against his former supervisor, Kearney, because Kearney was not Olick's "employer;"

8. assuming arguendo that the PHRA or CFEPA claims may lie against a supervisor who is not an "employer," Kearney was **not** responsible for the Knights' retaliatory conduct and is entitled to judgment in his favor on Olick's state law retaliation claim.

---

[1]     The Debtor's confirmed plan provides that any recovery will be used to fund his chapter 13 plan. (See Main Case Docket Entry No. 136). Therefore, this court has non-core jurisdiction over this adversary proceeding. See 28 U.S.C. §1334(b); id. §157(b)(2). The parties have consented to the entry of final judgment by the bankruptcy court. See generally In re Allegheny Health Educ. & Research Found., 383 F.3d 169, 175 (3d Cir. 2004) ("in non-core proceedings the bankruptcy court's power is limited to submitting proposed findings of fact and conclusions of law to the district court for entry of a final order after de novo review (unless the parties consent to adjudication by the bankruptcy judge)").

## II.  PROCEDURAL HISTORY

In February 2006, Olick commenced the first of four (4) lawsuits he filed against the

Knights and Kearney relating to his employment with the Knights as a life insurance agent in the

Court of Common Pleas for Northampton County, Pennsylvania ("the First Action").  Olick filed

the First Action before the termination of his employment relationship with the Knights,  In the

complaint, Olick asserted, <u>inter alia</u>, that the defendants were discriminating against him because

of his age by reducing his sales territory as an insurance field agent.

Shortly after filing the First Action, Olick received a COBRA Notice from the Knights

advising him that his employment and his family's health insurance benefits had been terminated

retroactive to November 1, 2005.  In response, in March 2006, Olick amended his complaint in

the First Action to add Aetna (his employer-sponsored health benefits provider) as a defendant.

Subsequently, he amended the complaint to add charges of retaliation.  Aetna removed the First

Action to the U.S. District Court for the Eastern District of Pennsylvania ("the District Court"),

at No. 06-cv-01531, whereupon Olick again amended the complaint, this time adding his co-

worker, Jenkins, as a defendant.  See <u>Olick v. Kearney</u>, 451 F. Supp. 2d 665, 670 (E.D. Pa. 2006)

(procedural summary).

In January 2007, Olick filed a second lawsuit against the Knights, Kearney, Jenkins and

Aetna in the District Court ("the Second Action").  See <u>Olick v. Kearney</u>, No. 07-cv-00121 (E.D.

Pa.).  Because the First Action (commenced in state court and removed to the District Court) and

the Second Action (collectively, "the District Court Litigation") involved common questions of

law and fact, the District Court consolidated them.  See <u>Olick v. Kearney</u>, No. 06-cv-01531 (E.D.

Pa., Docket Entry No. 163); <u>Olick v. Kearney</u>, No. 07-cv-00121 (E.D. Pa., Docket Entry No. 8).

4

On February 9, 2007, Olick filed the present chapter 13 bankruptcy case in this court. On February 13, 2007, approximately one (1) year after Olick first commenced employment-related litigation against Kearney and the Knights, after several of his claims had been dismissed by the court, and after the completion of extensive discovery with respect to the surviving claims, Olick filed a motion to voluntarily dismiss the District Court Litigation under Fed. R. Civ. P. 41. On February 20, 2007, the District Court granted Olick's motion without prejudice. See Olick v. Kearney, No. 06-00531 (E.D. Pa.) (Docket Entry No. 194). One day later, Olick, acting pro se, filed the first of his two (2) adversary proceedings in this court; he filed the second adversary proceeding on February 28, 2007. This court consolidated the adversary proceedings under Adv. No. 07-0060 on May 31, 2007. (See Adv. No. 07-0052, Docket Entry No. 60; Adv. No. 07-0060, Docket Entry No. 63).

In the two (2) adversary complaints, Olick named the same four (4) defendants that he named in the District Court Litigation and asserted several claims that were previously dismissed by the District Court. By order dated June 26, 2007, this court de-constructed the combined sixty-three (63) pages and six hundred ten (610) paragraphs of the two (2) adversary complaints and determined that there were actually ten (10) claims asserted against the defendants within the seven (7) counts.[2]

---

[2]     The court categorized and numbered the claims as follows:

> **COUNT I** – "Discrimination & Retaliation" (against Aetna, the Knights, Kearney and Jenkins);
>
> **COUNT II** – "Job Discrimination" (against the Knights and Kearney);
>
> **COUNT III. A.** – COBRA, Sections 502(a)(1)(A) and 606(a)(4) (against
>
> (continued...)

5

The scope of these adversaries has diminished considerably since their inception.   After several pre-trial motions were resolved, four (4) claims remained.[3]  Through his acceptance of Aetna's Offer of Judgment, see Fed. R. Bankr. P. 7068 (incorporating Fed. R. Civ. P. 68), Olick

---

[2](...continued)

                  Knights and Aetna);

                  **COUNT III. B.** – ERISA, Section 502(a)(1)(B) (against the Knights and Aetna);

                  **COUNT III. C.** – ERISA, Section 502(a)(3)(B) (against the Knights and Aetna);

                  **COUNT III. D.** – ERISA, Sections 502(a)(2) and 409(a) (against the Knights and Aetna);

                  **COUNT IV** - "Breach of Contract" (against the Knights and Kearney);

                  **COUNT V** - "Tortious Interference In Business and Contracts" (against the Knights, Kearney and Jenkins);

                  **COUNT VI** – "Breach of Contract" (against Aetna); and

                  **COUNT VII** – "Breach of Contract & Conversion" (against the Knights).

(See Adv. No. 07-0060, Docket Entry No. 73).

[3]       (See Docket Entry Nos. 73, 242, 277).  In my March 17, 2008 bench ruling on summary judgment, I concluded that the following claims remained:

                  1. Count I for retaliation against the Knights, Kearney and Jenkins;

                  2. Count III.A. for a COBRA violation against the Knights;

                  3. Count III.B. under ERISA against Aetna; and

                  4. Count III. C. for equitable claims under ERISA against the Knights for life insurance conversion.

(See Adv. No. 07-0060, Docket Entry No. 242).  Both Olick and the Knights filed Motions to Reconsider the March 17, 2008 Order.  (See id., Docket Entry Nos. 246 & 278).  These Motions resulted in the dismissal of the retaliation claim against Mr. Jenkins. (See id., Docket Entry No. 277), but in all other respects, the Motions were denied.  (See id., Docket Entry Nos. 277, 333 & 334).

settled his claims against Aetna,[4] which left the following claims for trial:

1.  a COBRA claim against the Knights;

2.  an ERISA claim against the Knights; and

3.  a retaliation claim under the ADEA, PHRA and CFEPA against the Knights and Kearney.

These claims were tried on December 19 and 22, 2008.  At trial, three (3) witnesses testified (Olick, Kearney and James Lee) and a substantial amount of documentary evidence was admitted.

## III.  FINDINGS OF FACT

Based on the evidence presented at the trial,[5] I make the following findings of fact.

### A.  The Knights Hires Olick to be a Field Agent

1.  On June 1, 1995, Olick entered into a contract with the Knights to be a field agent for the sale of life insurance policies in Pennsylvania.  (Ex. P-1).

2.  The Knights-Olick contract had three parties:  (1) Olick, the field agent; (2) Kearney, the

---

[4]      (See Adv. 07-0060, Docket Entry Nos. 256, 272, 286).

[5]      I may take judicial notice of the dockets and the content of the documents filed in the case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute.  See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998); see also In re Indian Palm Assocs., Ltd., 61 F.3d 197, 205 (3d Cir. 1995).  I may also take judicial notice of matters of record in the state courts within this jurisdiction.  E.g., In re Soto, 221 B.R. 343, 347 (Bankr. E.D. Pa. 1998).

general agent; and (3) the Knights.  (<u>Id.</u>).

3.    The Knights-Olick contract provided, <u>inter alia</u>, that:

    a.    Kearney, as general agent, appointed Olick a field agent as the Knights' insurance sales representative for various Knights "councils." (<u>Id.</u> ¶2)

    b.    The Knights could "change or revoke the assignment of designated councils at any time."  (<u>Id.</u>).

    c.    Kearney, as general agent, could "change or revoke the assignment of councils in accordance with the guidelines established by the [Knights]."  (<u>Id.</u>).

    d.    <u>"[n]othing contained in this Agreement shall be construed to create the relationship of employer and employee between the [Knights] and the Field Agent, between the [Knights] and the General Agent,</u> or between the General Agent and the Field Agent.  <u>The Field Agent shall be free to exercise independent judgment</u> as to the eligible persons from whom applications for insurance will be solicited, and as to the time and place of such solicitation. The Field Agent shall abide by rules and procedures established by the Order, but such rules and procedures shall not be construed as interfering with the freedom of action of the Field Agent as described in this Agreement."  (<u>Id.</u> ¶4) (emphasis added).

    e.    <u>Olick was required to "devote his full time and entire attention and energy to the services required under this Agreement, and he shall not engage in any other occupation or business.</u>"  (<u>Id.</u> ¶5a) (emphasis added).

    f.    Olick was required to "procure applications for Knights . . . insurance in a volume satisfactory to the [Knights] . . . ."  (<u>Id.</u> ¶5b).

    g.    Olick could not "accept a check or money order in payment of an initial premium" unless the check or money order was made payable to the Knights and, if he accepted cash, he was required to promptly convert the cash to a money order or cashier's check payable to the Knights.  (<u>Id.</u>  ¶5c).

    h.    Olick could not "publish or circulate any advertising or printed material, other than that furnished [by the Knights], without written authorization . . . ." (<u>Id.</u> ¶5d).

    i.    Olick was prohibited from submitting any "proposals or other applications for any form of insurance to any company, fraternal benefit society or broker, except as permitted by the Order."  (<u>Id.</u>).

      j.   the agreement could be "terminated by any of the three parties, for any reason, at any time by mailing written notice to the last known address of the other two parties.  Such termination shall take effect upon the mailing of said notice."  (Id. ¶15).

4.    Knights field agents receive benefits, including group health insurance, and may contribute to a 401K retirement plan. (2 N.T. at 7).

5.    During the relevant time period and while employed by the Knights, Olick and his wife and children received group health benefits through Aetna.

6.    The Knights' regular procedure is to send a fringe benefits package to newly hired field agents ("the Summary of Coverage"), which includes a booklet from the group life insurance carrier that describes a field agent's right, upon termination, to convert or continue his group life insurance policy.  (N.T. 12/19/08 (hereinafter, "1 N.T.") at 98; Ex. D-63).

7.    Olick received the fringe benefits package, including the group life insurance booklet, at the inception of his field agent relationship with the Knights.[6]

8.    The Summary of Coverage stated, inter alia:

      a.   "If any of your Life Insurance ceases because your service ceases . . . the amount of insurance that ceases . . . may be converted to an individual life insurance policy."  (Ex. D-63, at 39).

      b.   "To convert a life insurance policy, "written application must be made for an individual policy and the first premium must be paid on it within 31 days after cessation of insurance for any of the above reasons… The premiums for the converted policy will be at Aetna's then customary rates for the same policy issued to any other person of the same class of risk and age at the time the

_____

[6]    Olick testified that he never received a benefits booklet, notification of his right to convert his life insurance policy or an explanation of benefits from the Knights.  He claimed that it was not until after he filed litigation, that he received a summary of his benefits.  (N.T. 12/22/07 (hereinafter, "2 N.T.") at 107).  I do not credit Olick's testimony on this point.

converted policy is to become effective." (Id.).

9.    Kearney was Olick's supervising general agent for approximately ten (10) years. (2 N.T. at

6).

10.   Kearney began working for the Knights since 1981 and was appointed to be a general agent

in 1991.  (1 N.T. at 198, 216; 2 N.T.  at 4-5).

11.   As a general agent for the Knights, Kearney recruits, trains, supervises and, when

necessary, terminates the field agents that he supervises. (1 N.T. at 199; 2 N.T. at 76-77).

12.   Kearney also holds monthly meetings at his office with his field agents on the first Friday

of every month for purposes of reviewing last month's production, new sales ideas and

brainstorming.  (2 N.T. at 77-78).

13.   During the time he was a field agent for the Knights, Olick worked out of an office in his

home.  (2 N.T. at 77).

14.    During the time he was a field agent for the Knights, the Knights provided Olick with a W-

2 and withheld federal taxes from his compensation. (Exs. D-64-69, D-71-75)


**B. Olick's Employment Relationship with the Knights Deteriorates**

15.   Some time beginning in late 2004 or early 2005, the relationship between Olick and

Kearney began to sour.  It was also around this time that former co-defendant Jenkins

interviewed for a position with the Knights.  (2 N.T. at 97).

16.   In February 2005, Kearney orally advised Olick that the majority of his territory was going

to be reassigned to Jenkins.  (Ex. P-18; 1 N.T. at 244; 2 N.T. at 185).

17.   In March 2005, Kearney told Olick he should no longer attend the monthly agency

10

meetings.  (2 N.T. at 34, 41, 127).

18.   Effective May 1, 2005, Kearney reduced Olick's territory membership from 947 members

to 446 members by transferring certain councils to Jenkins. (Ex. P-13).

19.   Between May and September 2005, Kearney had very little, or perhaps no, dealings with

Olick.  (2 N.T. at 88, 127, 172-174).

### C.  The Knights' Process for Terminating Field Agents

20.   The Knights' general agents have the authority to initiate the involuntary termination of

field agents that they supervise.   (1 N.T. at 55).

21.   Prior to initiating the termination process, a general agent may give a "Notice of Intent to

Terminate" (herein, "Notice of Intent to Terminate") to a field agent.  The Notice of Intent

to Terminate does not effect a termination of the field agent.  It serves as a warning.  (2

N.T. at 12, 73).  The Notice of Intent to Terminate's purpose is to motivate the field agent

to improve sales production or otherwise meet the Knights' goals for the field agent and to

provide notice so that the field agent is not surprised if the Knights ultimately decide to

terminate the field agent's contract.  (2 N.T. at 74).

22.   In all field agent termination cases, whether voluntary (<u>i.e.</u>, the field agent resigns) or

involuntary (<u>i.e.</u>, the field agent is fired), and whether initiated by the field agent, the

general agent or the Home Office,[7] the Knights require that a "Termination of Contract"

form ("the Termination Form") be completed.  (See 1 N.T. at 64 (describing form as

---

[7]     Involuntary terminations also can be initiated by the Home Office.   (1 N.T. at 55).

"Notice of Termination" form)).[8]

23. When the general agent initiates an involuntary termination or when the general agent has been informed by the field agent of the field agent's intent to resign, the general agent completes the Termination Form.  The Termination Form provides for the effective date of termination, and is executed in four copies.  (Exs. P-22 & 23; 1 N.T. at 214).

24. The general agent then sends all four (4) copies of the completed Termination Form to the Knights' Home Office, specifically, to the Agency Department.  (1 N.T. at 74-75, 214-215).

25. The Agency Department expects to receive a Termination Form from the general agent as soon as possible after it has been prepared.  Typically, the general agent mails the Termination Form to the Agency Department no later than two (2) weeks after the general agent has executed the form.  (See 1 N.T. at 148-49).

26. Upon receipt by the Agency Department, the Termination Form is date-stamped.  (1 N.T. at 36, 46, 64).

27. Thomas Smith, Vice President of Agencies for the Knights, is supposed to review every termination and sign the Termination Form.  This does not always happen.  (1 N.T. at 111-12; Ex. P-98 at 58, 60).  Mr. Smith's signature is not essential to processing a termination.  (1 N.T. at 112).

---

[8]      As noted above, the Knights-Olick contract provided the following with respect to termination:

> that the agreement may be "terminated by any of the three parties [Olick, the field agent, Kearney, the general agent, or the Knights], for any reason, at any time by mailing written notice to the last known address of the other two parties.  Such termination shall take effect upon the mailing of said notice."

(Ex. P-1, ¶15).

12

28.   The Agency Department processes the field agent's termination by generating an interoffice

memorandum advising appropriate staff to stop deducting certain charges from the field

agent's commission checks (e.g., computer fees, the field agent's share of medical

insurance premiums) and distributes the Termination Form as follows:

   a.   The original is placed in the field agent's file.

   b.   The second and third copies are mailed to the general agent.  One copy is for
        the general agent.  The other copy is intended to be sent by the general agent
        to the field agent.

   c.   The fourth copy is mailed to the field agent directly.

(Exs. P-22 & 23; 1 N.T. at 46-49; 57, 110).

29.   The Agency Department is also responsible for creating and sending a COBRA notice to

the field agent.  (1 N.T. at 57, 65).

30.   If the general agent terminates a field agent, the Agency Department initiates the mailings

necessary to effect the termination of the contract.  (1 N.T. at 61-62).

31.   With respect to involuntary terminations that have been initiated by a general agent, the

field agent's effective termination date is usually determined by the date the general agent

supplies on the Termination Form.  (1 N.T. at 40-41, 120 –122, 149).[9]

---

[9]      In some cases, the termination of a field agent is initiated by the Agency Department, not
the general agent.  (1 N.T. at 37-38).  Because this case was not handled in that fashion, I make no
findings on that process.  If a field agent is terminated by the Agency Department (rather than by a
general agent), the effective date of an agent's termination is the date the Agency Department notifies the
field agent of the termination by telephone or fax.

### D.  James Lee's Role in the Termination of Field Agent Contracts

32.  James Lee ("Lee") was the Director of the Agency Department from 1993 until 2008, when he retired.  (1 N.T. at 16, 172).

33.  As the Director of the Agency Department, Lee was responsible for various employment issues for agents including hiring, licensure, benefits and terminations.  (1 N.T. at 17-18).

34.  Although Lee was not involved routinely in processing the termination of a field agent's contract, he resolved questions pertaining to terminations, including the proper termination date or the reason for a termination.  This occurred "maybe a dozen times a year."  (1 N.T. at 19).

35.  If a dispute arose between a general agent and a field agent concerning the proper, effective termination date for a field agent, to resolve the dispute, Lee generally would call the general agent and, in most cases, the general agent would ultimately agree with the field agent.  (1 N.T. at 26).

36.  If the general agent did not agree with the field agent, Lee would find other means to resolve the dispute and ultimately make the determination he thought proper.  (1 N.T. at 26).

37.  Although the standard field agent contract provides that a "termination shall take effect on mailing of said notice," from time to time, Lee would employ a termination date prior to the mailing date in order to reduce the deductions being made to the field agent's commission check (such as computer service charges and the field agent's share of medical insurance and life insurance premiums) in order to maximize the net compensation to be paid to the field agent following the termination (1 N.T. at 40-41).

14

38.    If a dispute arose concerning a field agent's effective termination date, and the field agent

preferred a termination date earlier than the one upon which the Termination Form was

mailed, Lee generally resolved the dispute in favor of the field agent to reduce the charges

against the field agent's compensation. (1 N.T. at 42-45).


**E.  The Knights' Notice of Intent to Terminate the Knights-Olick Contract**

39.    On September 8, 2005, Kearney sent Olick a Notice of Intent to Terminate, which Olick

received within a week of that date.  (Exs. P-17 & D-3; 2 N.T. at 128, 132-133).

40.    The Notice of Intent to Terminate that Olick received stated that:

> Agent Tom Olick has failed to produce an acceptable volume of business to
> justify continuance of his contract.  He has previously been made aware of the
> standards that exist in this Agency, and in spite of what I consider to be adequate
> training and supervision, has not responded.
>
> Unless an appropriate improvement takes place (as discussed with agent) this will
> serve as notice that . . . termination will be effective the last day of
> October 2005.

(Exs. P-17 & D-31; 2 N.T. at 13-14).

41.    When he sent him the Notice of Intent to Terminate, Kearney believed that Olick's

termination was inevitable.[10]

---

[10]        Kearney testified that when he sent Olick the Notice of Intent to Terminate in September
2005, he "was planning on keeping him 'til January of '06 just to see what would happen."  (2 N.T. at
18).  However, I do not consider it likely that Kearney deferred the termination to see if Olick's
performance would improve.  Based on the degree of estrangement that already existed between Kearney
and Olick by September 2005, (Kearney considered Olick to be an inadequate producer of new business
and, months earlier, had barred him from attending the regular meetings of Kearney's team of field
agents),  I find it far more likely that by September 2005, Kearney had no interest in retaining Olick as a
field agent, but that rather than terminating Olick immediately, Kearney believed that the termination was
best handled by giving Olick some advance notice before actually terminating him.

**F. Olick's Actions After His Receipt of the Notice of Intent to Terminate**

42.    Between September 2005 and February 2006, after receiving the Notice of Intent to

Terminate, Olick applied to other insurance companies for positions as a life insurance sale

agent.  (Exs. D-42, 43, 46; 2 N.T. at 129, 135-138, 180-181).

43.    Nevertheless, Olick wrote several insurance policy applications after he received the Notice

of Intent to Terminate.  (Ex. P-53; 2 N.T. at 106, 172-73, 177)

44.    On October 23, 2005, after receiving the Notice of Intent to Terminate, Olick contacted the

Allentown UC Services Center and applied for unemployment compensation benefits.  (2

N.T. at 146, 180-81; Ex. P-27).

45.    After Olick filed his unemployment compensation application, the Allentown UC Services

Center contacted the Knights and requested information about his employment status.(See

Ex. P-27 at Bates KC6851-6853).[11]

46.    In response to the Allentown UC Services Center's request, Cheryl Quinn, a paralegal for

the Knights, sent a letter dated November 10, 2005, stating that "Olick is currently an active

field agent who sells insurance under contract as an independent contractor with the

---

[11]    Olick's application for unemployment compensation is dated October 23, 2005 and
contains Olick's social security number and a note that he had been "fired."  His application lists his first
day of work for the Knights as June 1, 1995 and his last day as September 8, 2005.  (Ex. P-27 at Bates
KC6851; 2 N.T. at 148-152).  The Knights proffered this application as an exhibit at trial, presumably as
an alleged admission by Olick that he was aware that he had been terminated well before February 28,
2006.  Olick testified that he did not prepare this application, (2 N.T. at 149-152), however, and I credit
his testimony on this point.  I consider it more likely that the unemployment compensation officer took
certain information from Olick, prepared the application and sent it to the Knights.  The author of the
document may have misunderstood Olick and erred in completing the form.  Of course, it is also possible
that Olick did tell the author that he had been "fired" and that his last day of work was September 8,
2005.  I find it unnecessary to resolve this factual issue.  Even if Olick was the source of the information
that found its way on to Ex. P-27, I find that other, contrary evidence far more probative with respect to
the date of Olick's termination.  See Finding of Fact Nos. 80, infra; Part IV., infra.

Knights of Columbus."  (Id. at Bates KC6950; 2 N.T. at 150-52).

47.   Ms. Quinn sent a second letter dated January 10, 2006 to the Allentown UC Services

Center.  In that letter, she again stated that "Olick is currently an active field agent who

sells insurance under contract as an independent contractor with the Knights of Columbus."

(Ex. P-27 at Bates KC6849).


### G.  Kearney's Actions After Sending the Notice of Intent to Terminate

48.   Kearney changed Olick's council assignment in November 2005, resulting in a modest

increase in the number of members in Olick's sales territory.[12]

49.   Between September 2005 and the end of 2005, Kearney had no dealings with Olick, but did

not consider him terminated.  (2 N.T. at 89).

50.   In early January 2006, Kearney mailed a Termination Form bearing a January 1, 2006

termination date to the Agency Department ("the Lost Termination Form").   (1 N.T. at

205-206, 219; 2 N.T. at 46).  He did not mail it to Olick because he believed that he was

obliged to mail it to Olick only after he received it back from the Agency Department.  (2

N.T. at 208, 216).

51.   The Agency Department never received the "Lost Termination Form" and Kearney took no

---

[12]      In November 2005, Kearney deleted councils 313 and 345 from Olick's membership
territory and added 50% of council 372 and 100% of council 1552.  This change provided Olick with a
total membership of 714, which was actually an **increase** in membership of 66.  (See Exs. P-15 & 16).
The changes were supposed to be effective in January 2006, but were not actually implemented until
February 2006.  (See  2 N.T. at 48-50, 55; Exs. P-15, P-16 & D-27).  The record does not reveal why
Kearney made these changes or which set of councils (the ones taken from Olick or the ones transferred
to him), if any, may have been considered more desirable to a field agent.

immediate action to follow up in order to complete the termination process.  Because

Kearney did not receive it back from the Agency Department, he never mailed it to Olick.[13]

### H.  Olick's First Lawsuit and the Knights' Preparation of Termination Forms

52.    In the first half of February 2006, Olick filed a complaint in the Court of Common Pleas of

Northampton County, Pennsylvania alleging, inter alia, that he was a Knights field agent

and that the Knights and Kearney had discriminated against him unlawfully on account of

his age ("the Age Discrimination Complaint").  (Ex. P-19, at ¶68; 1 N.T. at 54).[14]

53.    The Knights was served with the complaint on February 14, 2006.

54.    On or around February 15, 2006, Lee learned about the First Action, checked Olick's

personnel file and discovered that there was no record of any termination.  (1 N.T. at 186).[15]

---

[13]        While it is troubling that neither Kearney nor the Agency Department has a copy of the
Lost Termination For, I credit Kearney's testimony that it was his intention to terminate Olick in the
beginning of the new year and that he sent the Lost Termination Form in early January 2006.  See also
n.31, infra.

[14]        Surprisingly, nothing in the record provides the precise date that Olick filed the Age
Discrimination Complaint in the Court of Common Pleas.  He must have filed it before the Knights was
served with it – i.e., at least several days prior to February 14, 2006.  (See Ex. P-19).

[15]        Lee testified that he was not aware of the First Action when he took the action that
resulted in Olick's termination with an effective date of November 1, 2005. (1 N.T. at 53-54, 161-162,
180-181).  I do not credit this testimony.

        According to Lee, everything was set in motion by a telephone call he allegedly received
from Olick in February 2006.  (1 N.T. at 70-72, 80-81, 90, 173).  Lee testified that Olick called him to
complain that he had resigned and that certain unauthorized deductions, including those for health
insurance and life insurance, were being deducted from his commissions.  Lee claims that he checked
Olick's personnel file to confirm the termination in response to Olick's call and that he was unable to
find the Termination Form that would have been associated with Olick's resignation.  Mr. Lee does not

(continued...)

55.   On February 16, 2006, Lee called Kearney to discuss Olick's termination and requested that

Kearney prepare a Termination Form to terminate Olick as a field agent.  (1 N.T. at 125,

227).[16]  Lee then provided Kearney with a blank Termination Form to complete for Olick.

(1 N.T. at 125).

56.   Kearney knew about the lawsuit no later than February 16, 2006.[17]

57.   That same day, Kearney's office faxed a Termination Form dated January 1, 2006 to the

Agency Department ("the 1st Termination Form").  The 1st Termination Form provided that

January 1, 2006 was the effective date of Olick's termination.  (Ex. P-22; 1 N.T. at 51-52,

204-206).

58.   The 1st Termination Form stated that the reason for Olick's termination was "[i]nsufficient

---

[15](...continued)
have a written record of this alleged telephone call from Olick.  (1 N.T. at 174-175, 186).

    Olick agrees that he made a telephone call regarding impermissible deductions, but claims that the call did not occur until March 15, 2006.  See Findings of Fact Nos. 93-94.  He further stated that, having filed the lawsuit, "as a matter of practice and prudence [he] would never have called either Kearney or the Knights and the very last thing [he] would ever do was get into a discussion that in anyway related to the complaint."  (2 N.T. at 106).

    I believe Olick and find that there was no telephone conversation between Lee and Olick in February 2006.  What I find more likely is that the First Action came to Lee's attention shortly after it was served on February 14, 2006 and this prompted Lee to check Olick's personnel file.  Upon that review, and having noticed the September 2005 Notice of Intent to Terminate in the file, Lee then contacted Kearney to determine why Olick had not yet been terminated.

[16]    There is no written record of this conference between Kearney and Lee, (1 N.T. at 135), but I find that the telephone conversation occurred.

[17]    Kearney testified that he became aware of Olick's lawsuit some time between February 15 and 22, 2006, but could not be more specific.  (1 N.T. 232-34).  However, Kearney spoke with Lee by telephone on February 16th.  See Finding of Fact No. 55, supra.  I find it inconceivable that Lee did not mention the existence and subject matter of that lawsuit during his telephone conversation with Kearney.

production, which was brought to his attention many times." (Ex. P-22).

59.    The 1st Termination Form was the first Termination Form the Agency Department received

in connection with Olick's field agent contract.

60.    Neither the Agency Department nor Kearney mailed a copy of the 1st Termination Form to

Olick, (1 N.T. at 208-209), and Olick never received a copy of it. (1 N.T. at 77-78, 218).

61.    Shortly after Lee received a copy of the 1st Termination Form, he had a discussion with

Bob O'Keefe,[18] Kearney's supervisor, because Lee had "questions" concerning the January

1, 2006 termination date set forth on the form. During this conversation, O'Keefe

suggested they have a conference call with Kearney to resolve the matter. (1 N.T. at 85-86,

109, 116-117, 126-127; Ex. P-98 at 33-37).

62.    On February 17, 2006, Lee, O'Keefe and Kearney had a three-way telephone call to discuss

Olick's termination date. (See 1 N.T. at 85-87, 119, 136, 144, 227-228; Ex. P-98 at 124-

125).[19]

63.    Following the Lee-O'Keefe-Kearney conference call, Lee decided to use November 1, 2005

as Olick's termination date. (1 N.T. at 96, 136, 143-144).

64.    Following the conference call, Lee asked Kearney to generate a different Termination Form

– one that reflected a termination date of November 1, 2005, rather than January 1, 2006.

(1 N.T. at 116-117; 125).

---

[18]    Mr. O'Keefe is the regional vice president for the Eastern Division. O'Keefe had a
working relationship with Lee and both reported to Mr. Smith. (1 N.T. at 109).

[19]    There is no written record of the February 17, 2006 Lee-O'Keefe-Kearney telephone
discussion. (1 N.T. at 135).

65.   Following the Lee-O'Keefe-Kearney conference call and upon Lee's instruction, Kearney

created a second Termination Form and revised Olick's termination date to November 1,

2005 ("the 2nd Termination Form").  (Ex. P-23; 1 N.T. at 204, 230, 235-236).

66.   On February 17, 2006, Kearney's office faxed the 2nd Termination Form to the Agency

Department.  (Ex. P-23; 1 N.T. at 99-100).

67.   Lee claims that selecting November 1, 2005 as the effective date for Olick's termination

was in Olick's best interest because it allowed Olick to be refunded any health insurance

premiums, life insurance premiums and computer service fees he paid between November

1, 2005 and March 1, 2006, (1 N.T. at 89, 93), and because both Olick and Kearney had

advised him Olick resigned on that date, (1 N.T. at  86, 89, 92-93, 227-228).

68.   Neither Olick nor Kearney ever informed Lee that Olick had resigned on November 1,

2005.[20]

69.   The 2nd Termination Form states that it was executed on November 1, 2005, even though it

was not.  (Ex. P-23).[21]

70.   Also on February 17, 2006, O'Keefe sent an e-mail to Kearney with "Olick Termination" in

the subject line, which stated the following:

> I need from you in writing a full and complete explanation on the circumstances
> leading up to Mr. Olick's termination.  In preparing this, consider the following
> questions:

---

[20]      Both Kearney and Olick deny making that statement to Lee.  (See 1 N.T.  228-29; 2 N.T.
106).  On this important factual issue, I credit their testimony over Lee's.  See Part IV., infra.

[21]      The Notice states that the reason for termination was:  "Insufficient Production, which
was brought to his attention many times."  (Ex. P-23)

1.  If he was, as you said yesterday, gone Nov. 1, why did you wait till
    January to terminate him?

2.  How should we interpret your January 1 termination if he was gone in
    November?  Was it not truthful?

3.  What do you think will happen when Olick receives a copy of
    termination effective Nov. 1 which is sent out from here Feb. 17?

There are just a few things to address.  You should obviously make reference to
any other aspects surrounding the matter.  Make sure your explanation of the
circumstances surrounding Olick's departure are full, complete, and truthful.  This
is a very serious matter, Jim, what with a lawsuit hanging over our heads.  I'm
counting on you to treat it that way.

Let me hear from you ASAP but no later than Wed., 2/22/06.

(Ex. P-21 at 1; Ex. P-98 at 134-135) (emphasis added).

71. After Lee received a copy of the 2nd Termination Form, he forwarded it to Smith.  (1 N.T. at

136); see also Finding of Fact No. 27, supra.

72. The 2nd Termination Form struck Smith as "odd" because it arrived on his desk in February

2006, but bore the date of November 1, 2005.  (Ex. P-99 at 106).

73. Mr. Smith handwrote an undated memo to Lee, Mike Paradis[22] and O'Keefe, which stated

the following:

Need full and complete explanation from GA.
What happens when we send T.O. a copy of a termination dated 11/1 on 2/17?

(1 N.T. at 104-105, 137; Ex. P-20; P-99 at 97-98).

74. Lee never responded to Smith's note.   (1 N.T. at 105, 137).

---

[22]     Mike Paradis is another Vice President in the Agency Department and worked as Mr.
Smith's assistant at the time.  (1 N.T. at 105, 109).

75.   Smith never signed the 2nd Termination Form.  (Ex. P-23, 1 N.T. at 106, 113); <u>see</u> <u>also</u>

Finding of Fact No. 27, supra.

76.   On February 22, 2006, Kearney sent an e-mail to O'Keefe in response to O'Keefe's

February 17, 2006 e-mail, which stated:

> Bob, answers to your Feb. 17th e-mail on the Olick termination are as follows: [1]
> I did not say Olick was gone Nov. 1st, <u>Jim Lee informed me during our</u>
> <u>conversation that Olick resigned Nov. 1st, which I have no documentation on that</u>
> <u>statement.</u> [2] <u>I terminated Olick Jan. 1st.2006 [sic] as not to have any low</u>
> <u>producers of his nature into 2006.</u>  When I found out from the Agency Dept. that
> Olick resigned in Nov.2005 [as per Jim Lee], I thought it would be appropriate to
> adjust the termination notice effective Nov. 2005. {3} [sic] I do not think anything
> should happen since the facts from the Agency Dept. state that Olick resigned,
> unknown to myself, Nov.2005.  <u>The only other aspect that should be addressed is</u>
> <u>the fact that Olick should not get one penny from the Kof C.  I would be very</u>
> <u>pleased to participate in any court proceedings to prove Olick has no basis in</u>
> <u>attempting to extort money from the K of C.</u>

(Ex. P-21 at Bates KC097) (emphasis added).

77.   After seeing Kearney's February 22, 2006 e-mail, Lee drafted a memo to Olick's file dated

February 28, 2006, which stated:

> I reviewed the e-mail from Jim Kearney in regards to the above name.
> I wish to point out that Jim [Kearney] did admit that Thomas had resigned on
> November 1, 2005.  Bob O'Keefe was a party to this conference call and agreed
> that Jim did admit that this agent resigned on November 1, 2005.

(Ex. P-24; 1 N.T. at 177).

78.   On February 28, 2006, the Agency Department circulated an "Inter-office Memo" to advise

various Knights' departments that Olick had been terminated effective November 1, 2005.

(Ex. P-25 at Bates KC092; 1 N.T. at 48-49, 51).

79.   On February 28, 2006, the Knights mailed the 2nd Termination Form to Olick.  (2 N.T. at

23

154).  (1 N.T. at 77-78).[23]

80.   The Knights-Olick contract was terminated on February 28, 2006, when the Knights mailed

Olick the 2nd Termination Form.[24]


### I.  The COBRA Notice

81.   The Knights, as the plan administrator[25] for Olick's group health benefits, prepared a

COBRA Notice dated February 28, 2006 that used November 1, 2005 as the date of the

"qualifying event" for Olick's termination of employment and for the date upon which to

terminate Olick's group health insurance.  (Ex. P-26 at 2).

82.   Lee is the Knights' representative who made the decision to use November 1, 2005 as the

"qualifying event" on Olick's COBRA Notice.  (1 N.T. at 91).

83.   On February 28, 2006, the Knights sent the COBRA Notice to Olick by "Priority

Overnight" via Federal Express.  The Federal Express Ship Manager Label states that the

COBRA Notice was to be delivered by March 1, 2006.  (Id.).

84.   On March 1, 2006, Olick received the COBRA Notice dated February 28, 2006.  (2 N.T. at

130).

---

[23]     Olick denies receiving the 2nd Termination Form in the mail.  (See 2 N.T. at 154).  I do
not credit his testimony on this point.

[24]     This pivotal finding is discussed in Part IV, infra.

[25]     ERISA defines the "plan administrator" as, inter alia, "the person specifically so
designated by the terms of the instrument under which the plan is operated."  29 U.S.C. §1002(16)(A)(i).
It is undisputed that the Knights is the plan administrator for Olick's group health benefits.

85.     On February 28, 2006, the Agency Department also sent a request to Aetna to terminate

Olick's health insurance coverage.  (Ex. P-103 at 16).

86.     At the Knights' request, Aetna terminated Olick's health insurance coverage retroactively

to November 1, 2005.  (Id.).

87.     The COBRA Notice stated that the monthly premium for continuing coverage would be

$1,144.09.  (Id.).

88.     The COBRA Notice provided that Olick had until April 28, 2006 (fifty-nine (59) days from

the date of the notice, February 28, 2006) to elect to continue his group health insurance

coverage.  (Exs. P-26, D-35).

89.     Olick did not elect COBRA coverage by April 28, 2006.

90.     At some point thereafter, Aetna sought to recover money from Olick for healthcare services

it paid to health care providers on behalf of Olick and his family during the period

November 2005 through February 2006.  (Ex. P-103 at 93, 222).


**J.  Retaliation**

91.     The Knights did not engage in retaliatory conduct for engaging in protected activity under

the ADEA by terminating Olick's field agent contract after Olick initiated the First Action.

92.     The Knights retaliated against Olick for engaging in protected activity under the ADEA

after Olick initiated the First Action by selecting November 1, 2005 as the "qualifying

event" in the COBRA Notice it sent to Olick, thus causing Olick's group health insurance

coverage to be terminated effective November 1, 2005.

93.     When the Knights terminated Olick's health insurance coverage retroactive to November 1,

2005 in retaliation against Olick, the Knights either knew or showed reckless disregard as

to whether its actions were unlawfully retaliatory under the ADEA.

### K.  Events After the Termination of the Knights-Olick Contract

94.  On March 15, 2006, Olick called the Knights' "Commissions Department" to discuss

certain deductions and credits that he was not familiar with that appeared on his

commission statement.  (2 N.T. at 131).

95.  In a memorandum dated March 15, 2006 and addressed to the "Knights of Columbus,

Commission Department," Olick claimed that there were a number of debits and credits

made on his commission statement for the period ending February 28, 2006 that he did not

recognize or understand.  (Ex. P-31).

96.  Consistent with the use of November 1, 2005 as his termination date and as the date of the

COBRA qualifying event, the Knights reimbursed Olick for health insurance premiums

they deducted from his commissions for the months November 2005 through February

2006.[26]

97.  After the First Action was removed to the District Court, Aetna sent Olick an Offer of

Judgment in November 2006, offering, inter alia, and with the Knights' cooperation, to

reset his termination date and provide Olick and his family with health insurance during the

---

[26]      During the months of November 2005 to February 2006, which consisted of seven (7)
pay periods, the Knights deducted a total of $1,648.78 for health insurance premiums from Olicks's
commission checks.  The Knights repaid Olick the $1,648.78 in two increments of $824.39 on February
28, 2006 and March 15, 2006.  (See Ex. D-38 at 3-4).

period at issue (i.e., November 1, 2005 through March 1, 2006).[27]  (Ex. D-40; 2 N.T. at

207-211).

98.    The November 2006 Offer of Judgment stated in relevant part:

> Aetna will retroactively deem that the member eligibility status for health benefits
> coverage under the Knights of Columbus health benefits plan ("the Plan") is in
> place for the period from November 2005 through March 1, 2006, for you, as well
> as for Kathryn Olick, David Olick and Matthew Olick even though they are not
> parties to this action.

(Ex. D-40).

99.    Olick did not accept the November 2006 Offer of Judgment.

100.    In late April 2008, in connection with the pending adversary proceedings in the bankruptcy

court, Aetna made a second Offer of Judgment, which was substantively identical to the

November 2006 Offer of Judgment with respect to the period of Olick's health insurance

coverage.  (Ex. D-41; 2 N.T. at 212).

101.    Olick accepted the April 2008 Offer of Judgment.

102.    As a result of Olick's settlement with Aetna, he has received all of the healthcare benefits

to which he was entitled under his group health plan for the period November 1, 2005

through March 1, 2006.  (See Aetna Offer of Judgment, Exhibit "A", Adv. No. 07-060

Docket Entry No. 256).

---

[27]    Counsel for the Knights corresponded with counsel for former co-defendant Aetna to
facilitate a settlement for Aetna.  (2 N.T. at 207-208).  Counsel for Aetna memorized the understanding
in a letter to the Plaintiff. (Ex. D-39).

# IV.  SUMMARY AND BRIEF ANALYSIS OF THE EVIDENCE

## A.

Throughout this litigation, the parties have sparred continually with respect to a central fact issue: When did Olick's field agent contract terminate?  Although the Knights' own witnesses contradicted each other on this key point, the Knights maintain that Olick resigned in November 2005 and that the 2nd Termination Form, albeit sent late, was accurate in identifying November 1, 2005 as the date of his separation from the Knights.  Olick, on the other hand, denies that he resigned [28]

After considering the witnesses' testimony and assessing their demeanor and credibility, and after reviewing the content of documentary evidence, I am firmly convinced that Olick did not resign in November 2005.  Rather, I find that Olick remained an active Knights field agent until February 28, 2006, when the Knights terminated his contract by sending him the 2nd Termination Form.

The primary evidentiary support for the Knights' contention was James Lee's testimony.  Lee, who worked at the Agency Department and had no direct involvement with Olick until February 2006, testified that Olick resigned as of November 1, 2005.  Lee testified that both Olick and Kearney told him in separate conversations in February 2006 that Olick resigned in

---

[28]        Olick further contends that he never received the 2nd Termination Form, that the 2nd Termination Form was never mailed to him and therefore, that the Knights <u>never</u> terminated his contract because they did not comply with the procedural requirements for termination set forth in the contract. Because I reject Olick's factual contention that he did not receive the 2nd Termination Form, his argument that the Knights never effected his termination fails.  I also note that nothing in the record suggests that Olick ever performed any field agent duties after the Knights sent the 2nd Termination Form and the COBRA Notice.  Thus, it appears that Olick was aware that the Knights considered him terminated and accepted that as a <u>fait accompli</u>.

November 2005. Also, on February 28, 2006, the date he caused the 2nd Termination Form to be sent to Olick, Lee drafted an internal file memo to document that during the three-way telephone call he had with Kearney and O'Keefe on February 17, 2006, Kearney advised him that Olick resigned on November 1, 2005.

Kearney denies telling Lee that Olick resigned in November 2005. Olick also denies that he ever told Lee that he resigned. Kearney testified convincingly that he would have never said Olick resigned because he had nothing in writing from Olick documenting a resignation and knew that, had he resigned, Olick would have generated a written record.

Kearney's explanation is persuasive. Olick has a propensity to document any matter that he believes may affect his legal rights. (See, e.g., Exs. P-11, P-14, P-18, D-12, D-13 and D-14). Therefore, I find it implausible that Olick would not have documented this most significant event. At the time, Olick felt mistreated by the Knights. Had he resigned, he certainly would have written a resignation letter and, most likely, provided multiple copies to all necessary (and perhaps some unnecessary) individuals. His departure undoubtedly would have been in writing, unmistakable and "noisy." This renders Kearney's and Olick's testimony more credible than Lee's testimony.

Several other compelling pieces of evidence support the finding that Olick did not resign in November 2005 and remained an active field agent until February 2006. First, the Knights' own records continued to list Olick as an active field agent through February 2006. Second, in November 2005, Kearney adjusted Olick's sales territory, transferring certain councils to and from Olick – not the action one would expect a general agent to take with respect to a field agent who had recently resigned. Third, in response to Olick's unemployment

29

compensation application, the Knights advised the unemployment compensation bureau on two

(2) separate occasions that Olick was an active field agent.[29]  Fourth, Olick submitted a new

policy to the Knights in February 2006  – again, not the action one would expect a field agent

who had resigned months earlier to take.

This evidence, compared to Lee's testimony that both Olick and Kearney told him that

Olick had resigned (statements that both Kearney and Olick credibly deny making)

overwhelmingly supports the finding that no resignation occurred in November 2005.[30]

---

[29]     Another piece of evidence that tends to support the Knights position is the fact that Olick applied for unemployment compensation on October 23, 2005. However, the October 23rd application for unemployment compensation benefits  preceded the alleged November 1st resignation.  Rather than having anything to do with a "resignation," the more likely explanation is that the application was triggered by Olick's receipt of the Notice of Intent to Terminate.  Olick was being cautious, i.e., in his mind, he was filing for unemployment compensation to prepare for his potential, impending unemployment.  Morever, as mentioned in the text above, the fact that the Knights responded on two occasions (November 10, 2006 and again on January 10, 2006) to the Allentown UC Services Center's request for information and stated that Olick was not separated from the Knights weighs heavily against the Knights' version of the story.

[30]     As for Lee's internal file memo of February 28, 2005.  I find that the content of the memo was false and that its purpose was to build a paper trail to: (a) establish that Olick had "self-terminated" with the Knights and (b) justify Lee's decision to back-date Olick's termination date (and "qualifying event" date for COBRA purposes) to November 1, 2005.

In reaching this conclusion, I have considered O'Keefe's February 17, 2006 e-mail to Kearney, (see Ex. P-21), in which O'Keefe asked Kearney why Kearney waited until January to terminate Olick if Olick was "gone" in November, see also Finding of Fact No. 70.  I find O'Keefe's e-mail ambiguous on the question whether Kearney told Lee that Olick had resigned in November 2005.  O'Keefe's employs the word "gone," rather than the word "resigned."   That suggests that, in the three-way telephone conversation of February 17, 2006, Kearney may have told Lee that, as a practical matter, by November 2005, Olick was no longer visible and had no  significant presence in Kearney's agency.  But this is a far cry from stating that Olick had resigned.  The real purpose of O'Keefe's e-mail appears to be to find out why Kearney waited so long after sending the September 2005 Notice of Intent to Terminate before taking any further action.  O'Keefe's question to Kearney may include an implied criticism of Kearney's apparent delay, which would explain why Kearney responded by saying that he had sent the Lost Termination Form to the Agency Department in January 2006.

**B.**

If Olick did not resign in November 2005, how and when was his field agent contract

terminated?

It is undisputed that Kearney sent Olick a Notice of Intent to Terminate in September

2005.  Most certainly, Kearney planned on terminating Olick's contract at some point in the

beginning of 2006.  See n.10, supra.  He took no further action to terminate Olick after sending

the Notice of Intent to Terminate until January 2006, when he prepared the Lost Termination

Form and forwarded it to the Agency Department.

Because the Lost Termination Form was either lost in the mail or misplaced by the

Agency Department,[31] the proposed termination of Olick's employment lay dormant until

February 14, 2006, when the Knights received notice that Olick named the Knights as a

defendant in a lawsuit that alleged, among other things, that the Knights were guilty of age

discrimination. This caused the Agency Department (specifically, Lee) to ask the question –  put

colloquially  –   "Who is this field agent, Thomas Olick, and why is he suing us?"  Minimal

investigation revealed that Olick was a field agent who was in the process of being terminated for

lack of productivity.  Lee then reached out to Kearney and directed Kearney to forwardthe 1st

Termination Form and, later, the 2nd Termination Form to the Agency Department in order to

---

[31]       I acknowledge that finding Kearney prepared the Lost Termination Form in January
2006 is perhaps the weakest link in the factual chain that I have constructed to make sense of the
conflicting testimony.  It is troubling that neither Kearney nor the Agency Department have a copy of the
original document.  The absence of any record of this significant action could support a finding that
Kearney fabricated a story about sending the form to Agency Department in January 2006 in order to
cover up a lack of diligence in failing to follow up on the September 2005 Notice of Intent to Terminate.
I have considered that possibility.  However, even though some doubt exists concerning Kearney's
credibility on this issue, it does not detract from the strength of the evidence, discussed in the text, that
supports Kearney's far more material and credible testimony that Olick did not resign in November 2005.

finally terminate Olick.[32]

## C.

In short, after piecing together the most credible aspects of the testimony of Lee, Kearney and Olick, I have reconstructed the most probable account of the events. My conclusions are that:

1. Olick did not resign in November 2005;

2. Kearney commenced the process to terminate Olick in January 2006, but nothing further occurred until after the Knights was served with Olick's complaint in the First Action;

3. At Lee's instruction, in February 2006, Kearney submitted termination notices to the Agency Department, the first of which was backdated to January 2006 to conform to the Lost Termination Form;

4. After receiving and rejecting the 1st Termination Form, Lee took the "backdating" concept one step further by instructing Kearney to prepare the 2nd Termination Form, terminating Olick effective November 1, 2005;

5. Olick was terminated on February 28, 2006, when the 2nd Termination Form was mailed to him.

6. On the same day, February 28, 2006, the Knights provided Olick with a COBRA Notice of his right to elect to continue his health insurance coverage, which advised him that he could make that election through April 28, 2006.

---

[32] Lee also took one additional, significant action. He decided to backdate Olick's termination date to November 1, 2005. This put Olick in the position of having to elect to continue his health insurance coverage under COBRA, at a monthly expense of $1,144.09, or lose his health care benefits for the four (4) month period from November 2005 to March 2006. This action had certain legal ramifications, as discussed below in Part V.C.

I turn next to the mixed fact-law and legal issues.  See generally In re 15375 Memorial Corp. v. Bepco, L.P., 2009 WL 4912136, at *7 (3d Cir. December 22, 2009) (discussing distinction among "basic" facts, "inferred" facts, and "ultimate facts" and referring to ultimate facts as either mixed questions of law or fact or conclusions of law).

# V . CONCLUSIONS OF LAW

## A.  COBRA

As explained below, the Knights violated COBRA by failing to give Olick the statutorily-required notice to elect continuation coverage of his health insurance.  Based on the circumstances underlying the Knights' statutory violation, I will exercise the discretion afforded the court under 29 U.S.C. §1132(c) to award Olick statutory damages in the amount of $13,200.00.

### 1.

COBRA requires plan sponsors for certain group health plans to provide continuation coverage to qualified beneficiaries who might otherwise lose coverage under their group plan as a result of a "qualifying event."  29 U.S.C. §1161.[33]

---

[33]       By its terms, 29 U.S.C. § 1161 does not apply to "any group health plan for any calendar year if all employees maintaining such plan normally employed fewer than 20 employees on a typical business day during the preceding calendar year."  29 U.S.C. §1161(b).   There is no assertion that the statutory exclusion applies in this case.

33

Congress enacted COBRA because it was concerned about the fate of individuals who, after losing coverage under their employer's ERISA plan, had no group health coverage at all. Continuation coverage would afford these individuals group health coverage until they were able to secure some other coverage. Recognizing the substantial costs continuation coverage would place on employer-operated ERISA plans, and thus beneficiaries of these plans, Congress did not make continuation coverage infinite in duration. Instead, Congress, under ERISA, gave beneficiaries a maximum period of either eighteen or thirty-six months of continuation coverage, a reasonable length of time for most to secure other group health coverage.

Fox v. Law Offices of Shapiro & Kreisman, 1998 WL 175865, at *7 (E.D. Pa., Apr. 13, 1998)

(quoting Nat'l Companies Health Benefit Plan v. St. Joseph's Hospital of Atlanta, Inc., 929 F.2d

1558, 1569-70 (11th Cir. 1991)).

Where, as here, the employer is also the plan administrator, see Finding of Fact No. 81,

the employer has 44 days after a "qualifying event" to notify the qualified beneficiaries of the

right to elect continuation coverage under COBRA.  29 U.S.C. §1166(a)(2), (a)(4); 29 C.F.R.

§2590.606-4(b)(2).  The qualified beneficiaries' election period (within which they may elect

continuation of group health benefits coverage) begins "not later than the date on which coverage

terminates under the plan by reason of a qualifying event" and ends not later than 60 days after

the date on which coverage terminates or the date on which the beneficiary receives notice under

§1166, whichever is later.  See 29 U.S.C. §1165.

The statute references a number of different circumstances that may constitute a

"qualifying event."  See 11 U.S.C. §1163.  The relevant "qualifying event" in this case is

termination of employment.  See 29 U.S.C. §1163(2).

ERISA provides employees and beneficiaries with a private cause of action against plan

administrators who fail to provide the required notifications under COBRA.  29 U.S.C.

34

§1132(a)(1).  The relevant provision at issue provides, in pertinent part:

> Any administrator (A) who fails to meet the requirements of paragraph (1)
> [relating to the requirement that written notice of COBRA rights be given at the
> commencement of group health coverage under a plan] or (4) [relating to the
> requirement that notice of COBRA rights be given within a certain time after the
> occurrence of a qualifying event] of section 1166 of this title ... with respect to a
> participant or beneficiary  .  .  .  may in the court's discretion be personally liable
> to such participant or beneficiary in the amount of up to $100 a day from the date
> of such failure  .  .  .  and the court may in its discretion order such other relief as
> it deems proper.

29 U.S.C. §1132(c).[34]

    In support of his claim for statutory damages under COBRA, Olick makes two primary

arguments.[35]  I address them both below.


## 2.

    Olick claims that the Knights violated COBRA because, based upon a qualifying event

disclosed as occurring on November 1, 2005, a COBRA Notice should have been sent by

December 14, 2005, forty-four (44) days later.  See 29 C.F.R. §2590.606-4(b)(2).[36]  Instead, the

---

[34]    Since the initial enactment of the statute, the civil penalty has been adjusted from
$100.00 per day to $110.00 per day.  29 C.F.R. § 2575.502c-1.


[35]    Olick makes a third, singular, argument that the Knights violated COBRA by sending
him a COBRA Notice even though he was never actually terminated in accordance with the procedural
requirements of his field agent contract and, thus, no "qualifying event" ever occurred.  If Olick's factual
premise is correct, (i.e., he was never terminated) and there was no "qualifying event," it would follow
that the Knights had no obligation to provide a COBRA Notice.  If the Knights had no duty to provide a
COBRA Notice, it is then difficult to understand how the Knights violated COBRA by sending one.  In
any event, I have found that Olick was terminated and that a qualifying event occurred.  Therefore, the
Knights had a duty to provide Olick with a COBRA Notice.


[36]    Section 2590.606-4(b) provides:

(continued...)

COBRA Notice was sent on February 28, 2006.   Olick requests that the court award him

discretionary, statutory damages of $100.00 per day under 29 U.S.C. §1132(c) for the period

December 14, 2005 to February 28, 2006 for the Knights' failure to timely provide the COBRA

Notice.

       Olick's claim fails because the qualifying event did **not** occur on November 1, 2005.

The "qualifying event" occurred on February 28, 2006, the date that the Knights terminated the

field agent contract by mailing the 2nd Termination Form. Obviously, the COBRA Notice, mailed

to Olick on the same day as the qualifying event, was timely under 29 C.F.R. §2590.606-4(b)(2).

Accord, Dougherty v. Blize, 2008 WL 2543430, at *6 (D. Del. June 25, 2008).

---

[36](...continued)
          (b) Notice of right to elect continuation coverage.

                    *   *   *

          (2) In the case of a plan with respect to which an employer of a covered
          employee is also the administrator of the plan, except as provided in
          paragraph (b)(3) of this section, if the employer is otherwise required to
          furnish a notice of a qualifying event to an administrator pursuant to §
          2590.606-2, the administrator shall furnish to each qualified beneficiary
          a notice meeting the requirements of paragraph (b)(4) of this section not
          later than 44 days after:

               (i) In the case of a plan that provides, with respect to the
               qualifying event, that continuation coverage and the applicable
               period for providing notice under section 606(a)(2) of the Act
               shall commence with the date of loss of coverage, the date on
               which a qualified beneficiary loses coverage under the plan due
               to the qualifying event; or

               (ii) In all other cases, the date on which the qualifying event
               occurred.

**3.**

Olick fares better with his second argument.  He correctly points out that the COBRA

Notice sets forth an erroneous statement of the date of the qualifying event (November 1, 2005,

instead of February 28, 2006).  This misstatement creates two (2) potential concerns, the first of

which is inconsequential in this case, but the second of which is significant.

The first concern is the possibility that the misstatement of the date of the qualifying

event will interfere with the core purpose of a COBRA Notice – which is to give the recipient

notice of the deadline for electing continuation health benefits coverage.  Perhaps there are

circumstances in which a misstatement of the date of the qualifying event could have this effect.

See generally Dougherty, 2008 WL 2543430, at *6 (denying motion to dismiss complaint

asserting claim that COBRA Notice's asserted failure to identify nature of the qualifying event

rendered the Notice "false and/or deceptive and incomplete").

In this case, however, I do not believe that the fundamental purpose of the COBRA

Notice was thwarted by the misstatement of the date of the qualifying event.  Notwithstanding

the erroneous date, the COBRA Notice unequivocally informed Olick that he had until April 28,

2006 to elect continuation coverage.  He chose not to elect COBRA coverage and has made no

showing that the Notice's disclosure of an erroneous qualifying event in any way affected or

impeded his decision or misled him into foregoing the coverage.

In another respect, however, the notice of the date of the qualifying event is crucial

information and the Knights' incorrect use of November 1, 2005 as the date cannot be blithely

disregarded.

In this case, there is a direct link between the qualifying event and the date on which

Olick's health benefits terminated.  The COBRA Notice advised Olick that his health benefits would terminate <u>on the date of the qualifying event</u> –  <u>November 1, 2005</u> – unless he elected continuation coverage.  The Notice should have stated that his health benefits would terminate as of <u>February 28, 2006</u> (the true date of his termination and therefore, the true date of the qualifying event) unless he elected continuation coverage.

In making the decision whether to elect continuation coverage, the recipient of the COBRA Notice is entitled to accurate information regarding the consequences of electing or not electing coverage. A potential four (4) month gap in health benefits coverage is material information that could have a substantial impact on the exercise of a former employee's business judgment whether to elect continuation coverage.  Thus, in this case, the COBRA Notice's erroneous disclosure of the date of the qualifying event and the erroneous disclosure that failing to elect would result in a four (4) month gap in health benefits coverage is a significant defect.  It warrants consideration of the imposition of discretionary statutory damages under 29 U.S.C. §1132(c).[37]

---

[37]    While Olick does not specifically raise the issue, I note that the COBRA Notice was also defective because it did not provide for a full sixty (60) day election period.  It provided for only fifty-nine (59) days (February 28, 2006 through April 28, 2006).  This, too, potentially could give rise to discretionary statutory damages under 29 U.S.C. §1132(c).

In this case, I decline to award damages for this misstatement for three (3) reasons.  First, the defect was as <u>de minimus</u> as is possible: one (1) day.  Second, nothing in the record suggests that the slightly shortened notice period affected Olick's decision or that he had any intention of electing continuation coverage.  Third, assuming <u>arguendo</u> that the statute authorizes a separate award of statutory damages for multiple defects in a single COBRA Notice, I believe that the misstatement of the date of the qualifying event was far more serious and that the statutory damages being assessed against the Knights for that defect, <u>see</u> Part V.A.4, <u>infra</u>, are sufficient to vindicate the deterrent purposes of COBRA's remedy provision.

**4.**

In deciding whether to assess a statutory damages under § 1132(c)(1), courts have considered factors as "bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." Boyadjian v. CIGNA Companies, 973 F. Supp. 500 (D.N.J ,1997) (quoting Pagovich v. Moskowitz, 865 F. Supp. 130, 137 (S.D.N.Y.1994); see also Mitrow v. Verizon Communications, Inc., 2007 WL  118014, at *13 (M.D. Pa. Apr. 19, 2007).

In this case the relevant considerations warrant an award of damages.

The incorrect statement of the date of the qualifying event in the COBRA Notice did not result from an innocent clerical error. Cf.  Fox, 1998 WL 175865, at *2 (defendant asserted that COBRA Notice was mailed to wrong address "inadvertently").  Here, the use of a "backdated" qualifying event was the product of a considered choice by the Knights management  – a decision as to which the Knights could muster only meager evidentiary support to justify. Cf. Hall v. Glenn O. Hawbaker, Inc., 2006 WL 3250869, at *9-13 (M.D. Pa., Nov. 8, 2006) (defendant's choice of date of qualifying event based on information as to which it was entitled to rely).  In fact, as discussed in Part V.C., infra, the Knights' decision to use November 1, 2005 as the date of termination and the date of the qualifying event was not the product of a good faith belief that he resigned on November 1, 2005; it was wholly unjustified and the product of animus directed against Olick.  Further, Olick was prejudiced by the Knights' conduct because he incurred medical expenses between November 1, 2005, the backdated qualifying event, and February 28, 2006, his true termination date.  These expenses were not paid until after he filed suit and reached a settlement with one of the Knights' co-defendants.

39

In these circumstances, the award of discretionary damages is appropriate to communicate to the Knights that an employee's contractual and statutory rights to health benefits are not subject to arbitrary or punitive denials by supervisors and administrators who are irritated by or dislike a particular employee.  See Rodriguez v. Int'l College of Business and Technology, Inc., 364 F. Supp. 2d 40, 50 (D.P.R. 2005) (the award of damages under 29 U.S.C. § 1132(c) "serves an important deterrence purpose"); Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1322 (S.D.N.Y. 1993) ("the primary focus of a court in assessing damages under [§1132(c)] should be the conduct of the administrator upon whom the liability is personally imposed"); Porcellini v. Strassheim Printing Co., Inc., 578 F. Supp. 605, 614 (E.D. Pa. 1983) (the award of statutory damages under §1132(c) is "intended to induce or compel compliance with the full disclosure principles which are embodied in ERISA"); In re Delphia Corp., 2007 WL 3376890 (Bankr. S.D.N.Y.  Nov. 7, 2007) (awarding plaintiff damages under §1132(c) in the absence of actual prejudice due to "statute's deterrent purpose [and the defendant's] size and sophistication").

Under 29 U.S.C. 1132(c), in its discretion the court may assess damages in the amount of up to $110.00 per day from the date of such failure or refusal."  See n.34, supra & accompanying text.  The court is given latitude to determine the amount of any per diem award as well as "the relevant fine period."  Fox, 1998 WL 175865, at *13.

Here, in light of the nature of the COBRA Notice violation, I find it appropriate to assess the maximum per diem damage award.  I will assess the per diem from November 1, 2005 (the false date provided for the qualifying event) to February 28, 2006 (the correct date of the qualifying event).  This results in a damage award of $13,200.00 (120 days x $110).

40

In quantifying the damage award at $13,200.00 as appropriate and sufficient to vindicate the purposes of the statute, I am influenced by several factors.  Through his settlement with Aetna, Olick already has been compensated for the actual damages he suffered as a result of the backdating of the qualifying event in that the medical expenses incurred between November 1, 2005 and February 28, 2006 have been covered.  Further, the Knights' monetary liability for the COBRA violation represents only a portion of the financial impact this litigation will have on the Knights.  As discussed below, the Knights also are liable for statutory damages for a violation of the ADEA, see Part V.D.3., infra, as well as for the costs of this action, see Fed. R. Bankr. P. 7054.[38]  In addition, given the extended duration and contentious nature of the multiple lawsuits between Olick and the Knights, I can only presume that the Knights' own legal fees in this matter are considerable.  In these circumstances, I am satisfied that the amount of the COBRA damages assessed above are sufficient to effectuate the deterrent purposes of the remedy provision of COBRA.

## B.  ERISA §1132(a)(3)(B)  - Olick's Life Insurance Policy

I turn next to Olick's claim regarding the Knights' failure to advise him of his right to convert his group life insurance policy to an individual policy and/or the Knights' alleged actions

---

[38]    I expect that Olick will request an award for his taxable costs and that his request will be substantial.  See In re Olick, 2008 WL 3837759, at *11 (Bankr. E.D. Pa. Aug. 12, 2008) (earlier  in this case, more than $13,000.00 of Olick's request for assessment of costs against Aetna following his acceptance of Aetna's Offer of Judgment denied because  "[t]o the extent that the costs were necessary, they were far more relevant to Mr. Olick's claims against Knights Defendants").  In making this observation, I express no view and do not prejudice the merits of the anticipated future request.  I suggest only that it is likely that costs in some amount will be awarded and that will have an additional financial impact on the Knights.

in precluding him from converting his life insurance policy.

Interpreting liberally Olick's articulation of the claim, I deduce that Olick asserts an equitable claim under ERISA arising from the backdated COBRA Notice.  Olick appears to suggest that the Knights' use of the erroneous date of November 1, 2005 as the qualifying event on the COBRA Notice prematurely started the clock on Olick's deadline to convert his group life insurance policy to an individual policy, thus causing that time period to expire and his policy to lapse.  At the summary judgment stage of this case, I held that COBRA does not apply to life insurance, see Noel v. Laclede Gas Co., 612 F. Supp. 2d 1061, 1064-65 (E.D. Mo. 2009), but that Olick was not foreclosed from asserting an ERISA claim for equitable relief based on the loss of his right to convert his insurance policy, see 29 U.S.C. § 1132(a)(3)(B);[39] Brown v. Aventis Pharm., Inc., 341 F.3d 822 (8th Cir. 2003).

The evidence on this claim was meager.

Olick testified that he never received any information about his right to convert his life insurance policy from a group policy to an individual policy, thereby implying that he did not know he had this option after termination of his field agent contract.  Lee testified that when the parties first entered into the Knights-Olick contract, the Knights sent Olick a Summary of Coverage, advising Olick of his right to convert the policy upon termination of the contract. See Finding of Fact Nos. 6, 8. This was a standard protocol when new field agents are retained.  See

---

[39]        The relevant provision under ERISA provides that  "a participant, beneficiary, or fiduciary" may bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. §1132(a)(3)(B).

42

Id. No. 6.

I have no reason to believe that the Knights did not follow standard procedure in Olick's case at the time his employment commenced and therefore, I find this portion of Lee's testimony credible. It is striking that while Olick vigorously protested the termination of his health benefits after receiving the COBRA Notice, he apparently took no similar action with respect to his life insurance benefits. If he believed that the "retroactive" termination date improperly cut off his life insurance policy conversion rights, surely he would have made those beliefs known to the Knights.

Olick's testimony on this subject was carefully worded. He did not claim that the Knights prevented him from converting his policy. He testified only that the Knights gave him no notice or opportunity to convert the policy. 2 N.T. at 108-09. Perhaps, then, Olick is arguing that the failure to provide him with notice of his right to convert violated ERISA. However, he has cited no contractual or statutory authority that imposed such an obligation on the Knights. Further, considering that, by 2006, Olick was a **life insurance sales agent**, **with at least ten (10) years experience under his belt**, I find any suggestion that he was unaware of the existence of an option to convert incredible.

In the circumstances described above, notwithstanding the potential for a backdated COBRA Notice to mislead a recipient into believing that the time period for converting a group life insurance policy had already run as of the date of the Notice, I am satisfied that Olick has not established that he was harmed by the COBRA Notice in this respect and conclude that it is not appropriate to exercise the equitable powers of the court to fashion a remedy in Olick's favor.

## C.  Retaliation

Olick's final claim is the retaliation claim under the ADEA, PHRA and CFEPA.  Olick

asserts that the Defendants (i.e., the Knights and Kearney) took adverse action against him

because of the age discrimination claims asserted in the First Action, filed against the Knights in

February 2006.  In analyzing these claim, I separately consider the two (2) distinct adverse

actions that occurred in February 2006: (1) the termination of the field agent contract and (2) the

use of November 1, 2005 as the date of termination (and qualifying event) in the COBRA Notice

that the Knights sent him on February 28, 2006.

I will first address these issues through the prism of the ADEA and afterward, in Part

V.E., infra, discuss Olick's state law claims.


### 1.  Threshold Issue: Whether Olick Was a Knights "Employee"

As a threshold matter,  I first consider whether Olick was an employee of the Knights

and/or Kearney.[40]  I do so because the ADEA protects only individuals who are "employees."

E.g., Cox v. Master Lock Co., 815 F. Supp. 844, 845 (E.D. Pa. 1993) (citing EEOC v. Zippo

Mfg. Co., 713 F.2d 32, 33 (3d Cir.1983), aff'd, 14 F.3d 46 (3d Cir.1993) (Table), overruled on

other grounds by Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992)).

The ADEA's definition of an employee is circular.  It states that an employee is "an

---

[40]      Previously, at summary judgment, the Knights argued that Olick could not state a
discrimination or retaliation claim under any relevant discrimination statutes because his relationship
with the Knights was that of an "independent contractor" and not an "employee." When I granted
summary judgment and dismissed Olick's age discrimination claim in an oral bench opinion, I
nevertheless found that there was enough of a record before me on Olick's "employee" status to raise a
genuine issue for trial.  That decision was later the subject of a written opinion when Olick requested
reconsideration.  See In re Olick, 398 B.R. 592 (Bankr. E.D. Pa. 2008).

individual employed by any employer." 29 U.S.C. §630(f). Therefore, I turn to case law to assist me in this inquiry.

In Nationwide Mut. Ins. Co. v. Darden, a case decided under ERISA, the Supreme Court held that courts should determine who qualifies as an "employee" by applying the common law of agency. 503 U.S. at 322-23. Since the Darden case was decided, federal courts have employed the Darden test to determine whether an ADEA plaintiff was an employee. See, e.g., Alba v. Hous. Auth., 400 F. Supp. 2d 685, 693 (M.D. Pa. 2005); Cox, 815 F. Supp. at 846.[41]

Whether an individual is an employee for purposes of the ADEA turns on "the hiring party's right to control the manner and means by which the product is accomplished." Darden, 503 U.S. at 323 (internal quotation omitted). Among the factors relevant to this inquiry are:

1.   the skill required;

2.   the source of the instrumentalities and tools;

3.   the location of the work;

4.   the duration of the relationship of the parties;

5.   whether the hiring party has the right to assign additional projects to the hired party;

6.   the extent of the hired party's discretion over when and how long to work;

7.   the method of payment;

8.   the hired party's role in hiring and paying assistants;

9.   whether the work is part of the regular business of the hiring party;

10.  whether the hiring party is in business;

---

[41]      Like ERISA, the ADEA defines an "employee" as "any individual employed by an employer." 29 U.S.C. §1002(6)).

11.    the provision of employee benefits; and

12.    the tax treatment of the hired party.

Id. at 323-24.

The presence or absence of any one factor is not necessarily dispositive.  The most significant factors in the Darden analysis center around the employer's ability to control the individual.  See Darden, 503 U.S. at 323 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989)); Weary, 377 F.3d at 528 (Clay, J., dissenting).

Here, the Knights largely rely on the Knights-Olick contract, which characterizes Olick as an independent contractor.  The contract explicitly cautions that "[n]othing contained in this Agreement shall be construed to create the relationship of employer and employee between the [Knights] and the [Plaintiff] . . . . " (See Ex P-1 ¶4).  Certainly, this evidence is relevant and persuasive in the inquiry, but, as stated above, it is not dispositive.  See, e.g., Weary v. Cochran, 377 F.3d 522, 525 (6th Cir. 2004).

Here, Olick's autonomy was quite constrained despite the fact that he worked "independently" for the Knights.  Most significantly, the Knights-Olick contract required that Olick "devote his full time and entire attention and energy to the services required under this Agreement" and that "he . . . not engage in any other occupation or business." (Ex. P-1 at ¶5).  In accordance with this mandate, the Knights requested that Olick surrender his sales licenses with other insurance companies upon his engagement with the Knights.[42]

---

[42]    The record was not entirely clear what exactly happened with Olick's other licenses upon the commencement of his relationship with the Knights.  It seemed that Olick initially declined to surrender his licenses upon the Knights' request in 1995 and that Kearney did not press the issue.  Olick

(continued...)

46

The Knights-Olick contract also required Olick to "procure applications . . . in a volume satisfactory to [the Knights]," controlled the manner in which Olick accepted and transmitted payment of initial life insurance premiums for policies he sold and prohibited Olick from publishing or circulating advertising or printed material other than that provided by the Knights without written authorization.  (Id.)

The Knights also had control over his sales territory and was able to change it at any time. (Id. ¶2).  Essentially, the Knights had the ability to exercise full control over the manner and the means by which Olick procured business and deemed itself to be Olick's sole means for making a livelihood.

It is also significant that Olick had a ten-year relationship with the Knights with no definite term, during which time the Knights provided him with employee benefits.  Olick received health insurance for himself and his family and also was able to participate in a 401K plan, which is certainly more suggestive of employee status than independent contractor status. See, e.g., Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica, 361 F.3d 1, 11 (1st Cir. 2004) (set length contracts and lack of benefits tend to suggest hired party was independent contractor); Farlow v. Wachovia Bank of N.C., N.A., 259 F.3d 309, 315 (4th Cir. 2001) (failure to provide benefits is indicative of independent contractor status).

---

[42](...continued)
claimed that the Knights again requested that he surrender his licenses at a later date.  He claims that he provided a resignation letter to Kearney for certain companies.

Whether Olick actually surrendered his licenses is not critical here.  More significant for purposes of the Darden analysis is that the Knights made Olick believe that he was prohibited from using the licenses and he seemingly complied with that prohibition during most of his tenure.  See Ex. P-6; 2 N.T. at 25-28, 144, 171-172.

Also suggestive of an employment relationship is the fact that the Knights provided Olick

with a W-2 and withheld federal taxes. Tr. of Resilient Floor Decorators Ins. Fund v. A & M

Installations, Inc., 395 F.3d 244, 250 (6th Cir. 2005) (that hiring party submits IRS Form 1099s

for hired parties, rather than IRS Form W-2s, is a factor tending to indicate that hired party is an

independent contractor); Farlow, 259 F.3d at 315 (same); EEOC v. North Knox Sch. Corp., 154

F.3d 744, 750 (7th Cir. 1998) (same).[43]

I have also considered that the record is devoid of certain potentially relevant evidence

that would support a finding that Olick was not an employee. For instance, there was no

indication that Olick required any special set of skills for his position with the Knights or that he

acquired those skills elsewhere. See Strange, 1997 WL 550016, at * 9 (E.D. Pa. Aug 21, 1997)

(finding that a lack of special skills required for a sales agent position militates in favor of

creating an employee-employer relationship). I also have no sense of how much freedom Olick

had on daily basis. How many hours did he have to work for the Knights? Did he have to log

those hours? Or, did he come and go as he pleased? Was he entitled to take a vacation whenever

he wanted? Although he had a "home office," there is no evidence that he formed a separate

legal entity to operate his "field agency," paid for his office supplies or had a staff.

From my vantage point, all I know is that the Knights organization dictated where and

how Olick could solicit Knights' members to sell insurance policies. The Knights provided

---

[43]    Although not raised by the Knights, these tax treatment factors favoring a finding that
Olick was an employee may be undermined by the Knights' form of payment and tax treatment toward
Olick. He was paid on a commissions basis and was treated as a "statutory employee" on the W-2. See
Finding of Fact No. 14; Weary, 377 F.2d at 535. Again, this tax treatment is relevant, but not dispositive.
Weary, 377 F.2d at 535-36. (Clay, J., dissenting).

48

Olick with his territory, which it was entitled to change, and maintained certain performance guidelines. It appears that Olick was required to work, albeit independently, within their specific business framework. Everything else remains a mystery.

In summary, this is a close call. Several <u>Darden</u> factors favor "independent contractor" status. However, the combined weight of all the factors, when considered together in light of the Knights' control over Olick, the Knights' provision of benefits to and tax treatment concerning Olick and common-law agency principles, convinces me that the working relationship constituted one of employer and employee.[44]

## 2.   Whether Olick Was an "Employee" of Kearney

In comparison, resolution of the question of Kearney's status with respect to Olick is not difficult. The evidence suggests that Kearney functioned only as Olick's supervisor, not his employer. Therefore, an ADEA claim does not lie against him. <u>See, e.g.</u>, <u>Stults v. Conoco, Inc.</u>,76 F.3d 651, 655 (5th Cir. 1996); <u>Birkbeck v. Marvel Lighting Corp.</u>, 30 F.3d 507, 510-11 (7th Cir.), <u>cert. denied</u>, 513 U.S. 1058 (1994); <u>Miller v. Maxwell's Intern. Inc.</u>, 991 F.2d 583, 587 (9th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1109 (1994).

---

[44]      I am aware that a number of federal courts have found insurance agents to be independent contractors and not employees. <u>E.g.</u>, <u>Weary</u>, 377 F.3d 522 (2-1 decision); <u>Barnhart v. New York Life Ins. Co.</u>, 141 F.3d 1310 (9th Cir.1998); <u>U.S. EEOC v. Catholic Knights Ins. Soc'y</u>, 915 F. Supp. 25 (N.D. Ill.1996). However, those determinations were factually based and not determinations that, as a matter of law, an insurance agent cannot be an employee.

### 3.  Elements of Olick's Claim for Retaliation Under the ADEA

In the absence of direct evidence of retaliation (i.e., a defendant's admission of a

discriminatory animus, see, e.g.,  Stephens v. Erickson, 569 F.3d 779 (7th Cir. 2009)), analysis of

a retaliation claim must proceed under the three (3) step burden shifting process derived from the

Supreme Court's decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Fasold

v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

First, the Plaintiff must prove the elements of a prima facie case of retaliation.  Keller v.

Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Second, if the plaintiff makes out a prima facie case, "[t]he burden of production (but not

the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient,

if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the

discharge."  Id..

Third, if the defendant satisfies its burden under step two (2), the plaintiff "must present

sufficient evidence to allow a factfinder to conclude that the employer's non-discriminatory

reason was a post hoc fabrication, or pretext."  Thimons v. PNC Bank, N.A., 254 Fed. Appx.

896, 898 (3d Cir. 2007) (nonprecedential) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d

Cir.1994)); see also Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (plaintiff's

rebuttal evidence "must allow a factfinder reasonably to infer that each of the employer's

proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not

actually motivate the employment action") (internal emphasis omitted) (quoting Fuentes, 32 F.3d

at 764).

50

### 4.  Olick's prima facie case

To demonstrate a prima facie case of retaliation under the ADEA, a plaintiff must show:

1.  he or she engaged in a protected activity;

2.  he or she was subject to an adverse action by the employer either subsequent to or contemporaneous with the protected activity; and

3.  there was a causal connection between the protected activity and the adverse action.

Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002); Fasold, 409 F.3d at 188;

see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (retaliation under title

VII).[45]


#### a.  Olick engaged in protected activity

A person has engaged in "protected activity" when he or she "has opposed any practice

made unlawful by . . . section [623]."  29 U.S.C. §623(d).  One of the practices that is made

unlawful by §623 is "discriminat[ion] against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such an individual's age."  29 U.S.C.

§ 623(a)(1).  Thus, a person has engaged in "protected conduct" when he or she opposes

---

[45]    I rely on federal case law to analyze Olick's retaliation claims under the PHRA and
CFEPA.  Courts in this Circuit have applied the same general standards and analysis under the ADEA to
retaliation claims under the PHRA because the PHRA is "substantially similar" to the anti-retaliation
provision of the ADEA.  See, e.g., Fries v. Metropolitan Mgmt. Corp., 293 F. Supp. 2d 498, 501 (E.D.
Pa. 2003), aff'd, 391 F.3d 506 (3d Cir. 2004); accord Fasold, 409 F.3d at 184 n. 8; Fogelman, 283 F.3d at
567 (citing Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996)).

Similarly, Connecticut courts look to federal employment discrimination precedent in
analyzing claims brought pursuant to the CFEPA.  Miller v. Hartford Fire Ins. Co., 2009 WL 1939808, at
*5 (D. Conn. July 6, 2009) (citing Levy v. Comm'n on Human Rights and Opportunities, 671 A.2d 349
(Conn. 1996)); O'Hazo v. Bristol-Burlington Health Dist., 599 F. Supp. 2d 242, 256 (D. Conn. 2009).

discrimination on the basis of age.  Barber v. CSX Distrib. Serv., 68 F.3d 694, 702 (3d  Cir.

1995); see also Rife v. Borough of Dauphin, 2009 WL 2151180, at *9 (M.D. Pa. July 17, 2009)

(race discrimination case under the PHRA); Miller v. Nat'l Life Ins. Co.,  2009 WL 347567, at

*9 (D. Conn. Feb. 11, 2009) (under the CFEPA).

 In his complaint in the First Action filed in February 2006, (see Ex. P-19), Olick alleged

that the Knights "engaged in a willful and deliberate scheme to replace [him] with a younger

agent, to defraud him and to improperly reduce future pension payments."  (Id. ¶123).  By filing

the discrimination law suit, Olick engaged in protected activity.  See Fasold, 409 F.3d at 188-

189; Walsh v. Irvin Stern's Costumes, 2006 WL 166509, at *5 (E.D. Pa. Jan. 19, 2006) (citing

Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 201 (3d Cir. 1994)).


**b.  the Knights subjected Olick to adverse actions after he engaged in protected activity**

 In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the

Supreme Court clarified what a plaintiff must show to satisfy the "adverse action" element of a

retaliation claim under Title VII.  I will apply the Burlington Northern standard to Olick's

retaliation claims because the ADEA's anti-retaliation provisions are not materially different

from those contained in Title VII.  See Koteles v. ATM Corp. of Am., 2008 WL 4412098, at *15

(W.D. Pa. Sept. 23, 2008) (applying Burlington standard to retaliation analysis under ADEA and

PHRA); Lee v. City of Philadelphia, 2008 WL 2697320, at *3 (E.D. Pa. July 3, 2008) (same).

 In Burlington Northern, the Supreme Court held that the adverse action element of a

retaliation claim "is not limited to discriminatory actions that affect the terms and conditions of

employment."  Burlington Northern, 548 U.S. at 64; Moore v. City of Philadelphia, 461 F.3d

52

331, 341 (3d. Cir. 2006). Rather, all that is required is an action that "well might have dissuaded

a reasonable worker from making or supporting a charge of discrimination." Burlington

Northern, 548 U.S. at 68 (internal quotation omitted). In so holding, the Supreme Court

emphasized that:

> We phrase the standard in general terms because the significance of any given act of
> retaliation will often depend upon the particular circumstances. Context matters. The
> real social impact of workplace behavior often depends on a constellation of
> surrounding circumstances, expectations, and relationships which are not fully
> captured by a simple recitation of the words used or the physical acts performed.

Id. (internal quotations omitted).

Here, approximately two (2) weeks after he served the Knights and Kearney with the First

Action, which alleged an age discrimination claim, Olick suffered two (2) distinct adverse

employment actions.

First, as explained above, Olick was terminated, a legally cognizable form of adverse

action. See, e.g., Mascioli v. Arby's Rest. Group, Inc., 610 F. Supp. 2d 419, 448 (W.D. Pa.

2009); Nesselrotte v. Allegheny Energy, Inc., 2009 WL 703395, at *12 (W.D. Pa. Mar. 16,

2009); Clair v. Agusta Aerospace Corp., 592 F. Supp. 2d 812, 824 (E.D. Pa. 2009).

Second, the Knights backdated the "qualifying event" on Olick's COBRA Notice to

November 1, 2005. The impact of this second adverse action was that Olick retroactively lost

health insurance coverage for four (4) months because he did not elect continuation coverage

after receiving the COBRA Notice. The backdating of the COBRA Notice (paired with the

concurrent loss of health benefits) constitutes an adverse employment action as the threat of

losing health benefits would dissuade a reasonable worker from making a charge of

discrimination. See Simmerman v. Hardee's Food Sys., Inc., 1996 WL 131948, at *14 (E.D. Pa.

53

Mar. 22, 1996) ("[a]lthough there is no exhaustive list of what constitutes adverse employment

action, examples include demotion, additional responsibilities, termination, denial of a deserved

promotion, pay <u>decrease or loss of benefits</u>") (emphasis added), <u>aff'd</u>, 118 F.3d 1578 (3d Cir.

1997) (Table).[46]


### d.  A causal connection exists between Olick's protected activity and  the backdating of the effective date of his termination

A plaintiff may rely on "a broad array of evidence" in establishing the causal link in a

retaliation claim.  <u>Farrell</u>, 206 F.3d at 283-84.  "To establish the requisite causal connection a

plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the

protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with

timing to establish a causal link."  <u>Lauren W. ex rel. Jean W. v. Deflaminis</u>, 480 F.3d 259 (3d

Cir. 2007); <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503-504 (3d Cir. 1997); <u>Woodson v.

Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir. 1997).

Whether the causal connection may be inferred solely from the close proximity in time

between the protected activity and the adverse action is dependent upon the particular factual

circumstances in a given case.  <u>See</u> <u>Farrell</u>, 206 F.3d at 279-80;[47] <u>Shellenberger v. Summit</u>

---

[46]       Had Olick elected COBRA coverage prior to April 28, 2006 as specified by the COBRA Notice that he received on March 1, 2006, he would not have lost the four (4) months of healthcare coverage. The COBRA election would have come at cost, however  – the amount of the monthly COBRA premium for the period November 2005 through February 2006 exceeded Olick's regular deduction from his compensation for his health benefits.  In these circumstances, imposing a higher premium to maintain healthcare benefits constituted an adverse employment action.  Such imposition is an action that would dissuade a reasonable worker from making a charge of discrimination.

[47]       In <u>Farrell</u>, the court observed that the case law is "seemingly split" on whether temporal
(continued...)

Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). As stated above, however, a plaintiff is not limited to proving a causal connection by pointing to evidence of a temporal proximity or by establishing demonstrative proof such as animus or antagonistic conduct. Instead, evidence of a causal link may be "gleaned from the record as a whole." Farrell, 206 F.3d at 284.

Here, a "temporal proximity" between Olick's protected activity and the adverse employment actions that is "unusually suggestive" of retaliation is present.

The Knights received Olick's age discrimination complaint on February 14, 2006. This generated a flurry of activity, including several memos and telephone conferences, resulting in the two (2) adverse actions that took place two (2) weeks later on February 28, 2006: Olick's termination and the backdating of his date of termination on the COBRA Notice.

I find that the short period of time between the protected activity and the adverse employment actions establishes the temporal proximity necessary to infer a causal connection for a prima facie case of retaliation. Accord Fasold, 409 F.3d at 190 (finding temporal proximity where time elapsed between protected activity and adverse action was less than three months); Schellenberger, 318 F.3d at 189 (finding that ten (10) business days was "more than temporal proximity"); Nesselrotte, 2009 WL 703395 at *13 (plaintiff terminated less than three months after initial complaint was sufficient to satisfy the causal connection prong). But see Malton v. Fed. Reserve Bank of N.Y., 2008 WL 2835470, at * 4 (D.N.J. July 18, 2008) (finding a period of

---

[47](...continued)
proximity between the protected activity and the alleged retaliatory act is sufficient in itself to create an inference of a causal connection for the purposes of a prima facie case. Farrell, 206 F.3d at 279. However, the court "caution[ed]" that this "split" is not an inconsistency in the analysis "but is essentially fact-based." Id. Courts have ruled differently depending upon how proximate the events were factually, and the context in which the issue came before them. See McCormick v. Allegheny Valley Sch., 2008 WL 355617, at *18-19 (E.D. Pa. Feb. 6, 2008).

close to two months between the protected activity and adverse action was not unusually

suggestive of causation).

Even if the activity within the two (2) week period at issue was not sufficiently suggestive

of causation, additional circumstantial evidence of retaliatory conduct exists.  See Fasold, 409

F.3d at 190; Farrell, 206 F.3d at 279-80.  Most striking and conspicuous were:

> 1.  the conflicting testimony of the Knights' own witnesses  –  Kearney and Lee –
>     regarding the reasons why the Knights used November 1, 2005 as Olick's
>     termination date.  See EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.
>     1997); see also Farrell, 206 F.3d at 281;[48] and
>
> 2.  the obvious hostility the Knights felt toward Olick because he filed the lawsuit.[49]

In the end, not only did the Knights' witnesses fail to offer a consistent explanation for

selecting the November 1, 2005 termination date, but none of the Knights' witnesses offered

testimony that, even if viewed in isolation, offered a credible explanation for backdating Olick's

termination date.  The backdating of the termination date to Olick's detriment –  an action taken

---

[48]     The Farrell court stated:

> Although timing and ongoing antagonism have often been the basis for the
> causal link, our case law clearly has allowed a plaintiff to substantiate a causal
> connection for purposes of the prima case through other types of circumstantial
> evidence that support the inference.  For example, a plaintiff may establish the
> connection by showing that the employer gave inconsistent reasons for
> terminating the employee.

Farrell, 206 F.3d at 280-81 (emphasis added).

[49]     Kearney demonstrated this hostility when he wrote, "Olick should not get one penny
from the K of C . . .  in attempting to extort money from the [Knights]."  Finding of Fact No. 76.

without any apparent rational justification[50] and occurring so closely on the heels of Lee and

Kearney learning that Olick had sued the Knights (and Kearney personally) – convinces me that

the backdating was a retaliatory act, caused by Olick's assertion of his age discrimination claim.

Therefore, I am satisfied that Olick has established the causal connection between his protected

activity and the adverse action of backdating his termination date.


**e.  no causal connection exists between Olick's protected activity and the termination of his
field agent contract**

At the same time, however, the record does not support a finding that the act of

terminating Olick's field agent contract was retaliatory.

Without question, the manner in which the Knights handled the termination was clumsy,

perhaps even incompetent.  Nevertheless, after observing the witnesses and considering the

content of their testimony, I am left with the firm impression that the Olick's termination was

inevitable once Kearney issued the Notice of Intent to Terminate Olick in September 2005.

Kearney followed up on this intent by attempting (unsuccessfully) to initiate the termination

process in January 2006.  See Finding of Fact No. 41 & n.10 thereto.

The inevitability of the termination severs the causal connection between Olick's

protected activity and his ultimate termination on February 28, 2006.  See Windfelder v. May

Dep't Stores Co., 93 Fed. Appx. 351 (3d Cir. 2004) (nonprecedential) ("Employers are not

obligated to suspend all previously planned or contemplated actions upon receiving a Title VII

complaint or learning that a suit has been filed.") (citing Clark County Sch. Dist. v. Breeden, 532

---

[50]      I elaborate on the inadequacies in the Knights' explanation in Part V.C.5, infra.

57

U.S. 268, 272 (2001)).  The lack of causation is fatal with respect to Olick's claim insofar as he asserts that the termination of his field agent contract was an actionable, retaliatory act. Consequently, Olick did not establish a <u>prima facie</u> case that the Knights' termination of his field agent contract was retaliation for his assertion of the age discrimination claim.

Having determined that Olick established a <u>prima facie</u> case of retaliation only with respect to the backdating of his termination to November 1, 2005 (that date also being the date of the qualifying event on Olick's COBRA Notice), I next consider steps two (2) and three (3) under the <u>McDonnell Douglass</u> framework with respect to that claim.

### 5.   The Knights proffered a legitimate non-retaliatory reason for their actions

Olick's success in establishing a <u>prima facie</u> case shifts the burden of production to the Defendants to articulate a "legitimate, non-retaliatory reason for its adverse employment action." <u>Krouse</u>, 126 F.3d at 500; <u>see also</u> <u>Texas Dep't of Community Affairs v. Burdine,</u> 450 U.S. 248, 254-55 (1981).  Although the burden of proof shifts, the ultimate burden of persuading the trier of fact remains at all times with Olick.  <u>Krouse</u>, 126 F.3d at 501.  As explained in <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 n.2 (3d Cir. 1997), the defendant's burden is "relatively light" at this stage:

> [The burden] is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge. At this point, the presumption of discrimination drops from the case.

<u>Id.</u>  Therefore, the Knights must only present a reason for the action; the Knights is not required to show by a preponderance of the evidence that its action was, in fact, motivated by the particular reason.

58

Here, the Knights satisfied its relatively light burden by offering a non-retaliatory reason
for backdating Olick's COBRA Notice – i.e., that it was actually an effort to help him.
According to Lee, using the November 1, 2005 date not only comported with Olick's alleged
resignation, but also would result in a credit to Olick for any unnecessary charges he had paid
after that "resignation."

**6.  Olick established that the Knights' justification for the adverse action was pretextual**

The Knights' proffer of a legitimate non-retaliatory reason for the backdating of Olick's
COBRA Notice shifts the burden back to Olick to prove by a preponderance of the evidence that
the Knights' proffered reason is nothing more than a pretext for retaliation.  Fasold, 409 F.3d at
185; Shellenberger, 318 F.3d at 190.

Pretext may be shown by demonstrating "such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons
for its action that a reasonable factfinder could rationally find them unworthy of credence."
Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 306 (3d Cir. 2007) (internal quotations
omitted).  Coupled with the plaintiff's prima facie case, evidence that the employer's asserted
reason for its adverse action is false may permit the factfinder to conclude there was unlawful
retaliation.  Id.; accord Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (2000).

As the Supreme Court stated in Reeves and the Third Circuit quoted in Marra:

> In appropriate circumstances, the trier of fact can reasonably infer from the
> falsity of the explanation that the employer is dissembling to cover up a
> discriminatory purpose.  Such an inference is consistent with the general
> principle of evidence law that the factfinder is entitled to consider a party's
> dishonesty about a material fact as 'affirmative evidence of guilt.'  Moreover,
> once the employer's justification has been eliminated, discrimination may well

59

be the most likely alternative explanation, especially since the employer is in
the best position to put forth the actual reason for its decision.

Marra, 497 F.3d at 306 (quoting Reeves, 530 U.S. at 147).

In addition to showing that the Knights' proffered reason for taking adverse action is

pretextual, Olick must also show that impermissible retaliation was a "determinative" factor or a

"but-for" cause in the adverse employment action.  Cerol v. Temple Univ. of the Commonwealth

Sys. of Higher Educ., 2007 WL 2345276, at *11 n.11  (E.D. Pa. Aug 16, 2007) (citations

omitted), aff'd, 303 Fed. Appx. 37 (3d Cir. 2008); accord, Krouse, 126 F.3d at 501 (plaintiff

must prove that "retaliatory animus played a role in the employer's decision making process and .

. . that it had a determinative effect on the outcome of that process.").

As previously discussed, the record is rife with inconsistencies regarding the Knights'

reason for using November 1, 2005 as the date of Olick's termination and the "qualifying event"

on Olick's COBRA Notice.  The glaring tension between the testimony of the Knights' key

witnesses vitiates its proffered explanation for its action and arguably, by itself, is enough to

suggest that the action was pretextual.  If Olick did not resign and was not terminated on

November 1, 2005, there is no legitimate basis for using that date.  However, there is still further

evidence in the record to substantiate that the act was pretextual.

The logic and mathematics behind its proffered reason further undermines the Knights'

explanation.  How could backdating the date of the qualifying event on the COBRA Notice work

to Olick's benefit?  The backdating caused Olick to lose coverage for medical services for

himself and his family for a four (4) month period.  How could Lee know that this was to Olick's

benefit without comparing the cost to Olick's health care premiums (plus, perhaps, computer

fees) with the health care expenses Olick incurred during the relevant time period?

60

Conspicuously absent from Lee's testimony was any suggestion that he went through such an analysis or even asked Olick which termination date he would prefer.  Further, use of the November 1, 2005 termination date facially appears harmful to Olick.  Based on a termination date of November 1, 2005, for Olick to have received health insurance coverage for the period of November 1, 2005 to February 28, 2006, he needed to elect and pay COBRA coverage of $1,144.09 per month and have it applied retroactively for four (4) months at a total cost of $4,576.00.  By comparison, as an active employee, Olick paid a total of only $1,648.78 in health insurance premiums for the same period.  (Ex. P-32).

I am struck by still another irregularity in the process by which the Knights terminated Olick's field agent contract.  Given the flurry of management activity at the Agency Department in the latter half of February 2006 with respect to Olick's status, I would have expected the Knights to go out of its way to document the termination process and to follow protocol to the letter.  Yet, even after Smith, the Vice President of Agencies and the highest-ranking manager involved in the process, wrote a note to Messrs. Lee, O'Keefe and Paradis, expressing his view that this termination seemed "odd,"  Lee neglected to respond to Smith's concern and provided no explanation for that lack of a response.  While the record suggests it was not essential for Mr. Smith to review and sign all Termination Forms, I would have expected his subordinates to obtain his express approval of this particular termination once he expressed concern about it and in light of the fact that Olick already filed a lawsuit against the Knights.

It comes down to the following.  When Lee decided to backdate the qualifying event on the COBRA Notice, he knew about Olick's age discrimination complaint.  Against the backdrop of the conflicting explanations regarding the date of termination, the Knights' failure to follow its

61

own protocols and Lee's unconvincing explanation for backdating the date of the qualifying

event on the COBRA Notice to Olick's financial detriment, I find that the Knights took this

adverse action to retaliate against Olick for exercising his right to assert an age discrimination

claim.[51]


### D.  Remedies

### 1.  the ADEA's remedial scheme

Section 626(b) of the ADEA largely incorporates the enforcement powers, remedies, and

procedures of the Fair Labor Standards Act ("FLSA") set forth in 29 U.S.C. §§ 211(b), 216

(except for subsection (a)), and 217.  See 29 U.S.C. §626(b).

The FLSA's enforcement provision provides that any employer who violates the statute

"shall be liable to the employee or employees affected in the <u>amount of their unpaid minimum</u>

<u>wages, or their unpaid overtime</u> compensation . . . <u>and in an additional equal amount as</u>

<u>liquidated damages</u>." 29 U.S.C. §216(b) (emphasis added).  The FSLA also authorizes an award

of attorney's fees and costs.  Id.  Thus, the FLSA provides for a successful plaintiff to be awarded

---

[51]      Assuming arguendo that a PHRA retaliation claim may lie against Kearney even though
he is not an employer, see 43 Pa. Stat. Ann. § 955(d) (prohibiting retaliation by, inter alia, "any person
[or] employer"); Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552-53 (3rd Cir.1996) (individual
supervisory employee can be held liable under an aiding and abetting/accomplice liability theory
pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent
further discrimination by an employee under supervision. ); Glickstein v. Neshaminy School Dist., 1997
WL 660636, * 11-12 (E.D. Pa. Oct. 22, 1997)(same),  I do not find Kearney culpable for the retaliatory
conduct.  Kearney may have been hostile to Olick, as evidenced by his memo volunteering to assist in the
Knights' defense against Olick's age discrimination suit, but it was Lee's decision, not Kearney's, to use
the November 1, 2005 termination date.

As for the CFEPA, supervisors are not liable under that statute.  See Rieger v. Orlor,
Inc., 427 F. Supp.. 2d 105, 122 (D. Conn. 2006) (citing Peroneal v. Hartford, 792 A.2d 752 (Conn.
2002)).

his or her lost compensation, liquidated damages in the same amount and attorney's fees and costs.

The text of the ADEA provides that any "[a]mounts owing to a person as a result of a violation of this chapter" shall be treated as "unpaid minimum wages or unpaid overtime compensation" for purposes of the FLSA remedies that the ADEA incorporates. 29 U.S.C. §626(b). Courts have construed this provision to entitle an ADEA claimant to "to be made whole for losses sustained" as a result of an employer's violation of the statute. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1100 (3d Cir. 1995). Thus, the ADEA damages are measured by the amount of "the losses sustained in lost wages and other benefits." Dreyer v. Arco Chem. Co., 801 F.2d 651, 656 (3d Cir. 1986); Anderson v. Consol. Rail Corp, 2000 WL 1622863, at * 3 (E.D. Pa. Oct. 25, 2000). This would include the value of lost healthcare benefits. See, e.g., Wilson v. S & L Acquisition Co., L.P., 940 F.2d 1429, 1438-39 (11th Cir. 1991); Blackwell v. Sun Elec. Corp., 696 F.2d 1176, 1185-86 (6th Cir. 1983); Curtis v. Robern, Inc., 819 F. Supp. 451, 459 (E.D. Pa. 1993); see generally Pattee v. Georgia Ports Auth., 512 F. Supp. 2d 1372, 1380-81 (S.D. Ga. 2007) (discussing different methods of measuring value of lost health benefits with respect to §1983 claim); Millsap v. McDonnell Douglas Corp., 2002 WL 31386076, at *7 (N.D. Okla. Sept. 25, 2002) (same, with respect to ERISA claim), rev'd in part, 368 F.3d 1246 (10th Cir. 2004).

One major difference between the ADEA and the FSLA, however, is that the ADEA provides for liquidated damages only "in cases of willful violations". 29 U.S.C. § 626(b). Thus, under the ADEA, the damages awarded may be doubled under its liquidated damages provision only when a finding is made that an employer **willfully** violated the statute. See, e.g., Potence v.

63

Hazleton Area Sch. Dist., 357 F.3d 366, 372 (3d Cir. 2004); see also Hazen Paper Co. v.

Biggens, 507 U.S. 604, 616 (1993).  An ADEA violation is willful if the employer either "knew

or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

Hazen Paper Co., 507 U.S. at 617.

　　　With these principles in mind, I determine the appropriate remedy for the Knights'

violation of the ADEA.  In connection with his retaliation claim, Olick requests statutory

damages, punitive damages and costs.[52]  I consider each of these requests below.


### 2.  Olick's actual monetary loss caused by the unlawful retaliation

The injury Olick suffered as a result of the Knights' retaliatory conduct was the loss of

health insurance coverage for the time period from November 1, 2005 through February 28,

2006.[53]  Therefore, Olick's out-of-pocket damages are limited to the value of those lost health

---

[52]　　From my review of Olick's pro se submissions, I am not entirely sure whether he seeks damages for pain and suffering or emotional distress as a result of the Knights' retaliatory conduct. However, it is well established that damages for pain and suffering or emotional distress are not available under the ADEA.  Comm'r  v. Schleier, 515 U.S. 323, 326 (1995); Wehr v. Burroughs Corp., 619 F.2d 276, 284 (3d Cir. 1980); Rogers v. Exxon Research & Eng'g Co., 550 F.2d 834, 841-41 (3d Cir. 1977), overruled on other grounds in Smith v. Joseph Schlitz Brewing Co., 584 F.2d 1231 (3d Cir. 1981); McGehean v. AF & L Ins. Co., 2009 WL 1911618, at *2 (E.D. Pa. June 30, 2009); Helfrich v. Lehigh Valley Hosp., 2003 WL 23162431, at *6 (E.D. Pa. Dec. 22, 2003 ) (citing Blum v. Witco Chem. Corp., 829 F.2d 367, 376 (3d Cir.1987)).

　　　The PHRA differs from the ADEA in one respect.  Under the PHRA, a successful plaintiff may recover for damages for humiliation, emotional distress, and mental anguish.  See Clarke v. Whitney, 975 F. Similarly, an award of compensatory damages is available under the CFEPA.  Ragin v. Laidlaw Transit, Inc. 1999 WL 977603, at * 4 (D. Conn. 1999) Supp. 754, 758 (E.D. Pa. 1997); Lubin v. Am. Packaging Corp., 760 F. Supp. 450, 452 (E.D. Pa. 1991).  However, Olick presented no evidence that would support an award of damages of this nature.

[53]　　Nothing in the record suggests that Olick suffered any other monetary detriment.  To the extent that he was entitled to his commission-based compensation for the period November 2005 through

(continued...)

benefits during that time frame. Aetna's Offer of Judgment, which Olick accepted, provides a

means of measuring Olick's loss because it purported to identify all of the medical expenses

Olick and his family incurred during that period.

In the time period in which Olick was not covered by health insurance, Olick incurred

$3,446.61 in healthcare expenses. (See Aetna Offer of Judgment, Exhibit "A", Adv. Nos. 07-

0060 Docket Entry No. 256). During the time period, Olick would have expended $1,648.78 in

premiums for the coverage. See n.26, supra. Therefore, Olick's monetary loss amounted to

$1,797.83. See Pattee, 512 F. Supp. 2d at 1380 (in calculating actual damages, courts should

employ methodology that makes plaintiff whole, which may include reduction for "withholdings

that would have been made for health insurance"); Millsap, 2002 WL 31386076, at *8

(suggesting that damages may be measured by amount that "a plaintiff's claimed medical

expenses exceed the cost of premiums").


### 3.  Olick's entitlement to liquidated damages

As explained above, I find that the Knights' conduct toward Olick was purposeful and

intentional. I further find that, in the circumstances presented, the Knights' either knew or

showed reckless disregard whether its actions were unlawfully retaliatory under the ADEA and

therefore, an award of liquidated damages in the amount equal to the value of Olick's monetary

loss under the ADEA is warranted.

Courts have differed in evaluating the relationship between a finding of retaliatory

---

[53](...continued)
February 2006, it appears that the Knights paid him all that was due.

conduct and the willfulness necessary to support an award of liquidated damages under the

ADEA.  Compare Rose v. Hearst Magazines Div., Hearst Corp., 814 F.2d 491, 493 (7th Cir.

1987) (reversing jury finding of non-willfulness as "irreconcilable" with finding of retaliation);

Amos v. Hous. Auth. of Birmingham Dist., 927 F. Supp. 416, 420 (N.D. Ala. 1996) (court

finding it difficult "to conceive of an employer who is motivated by an intent to punish an

employee for [engaging in protected activity], not also being guilty of an intent to violate the law

or at least guilty of reckless disregard for the law") with Grant v. Hazelett Strip-Casting Corp.,

880 F.2d 1564, 1571 (2d Cir. 1989) (proof of retaliation may result in a finding of willfulness,

but it need not in every case); Anderson v. Phillips Petroleum, 861 F.2d 631, 636 (10th Cir. 1988)

(declining to adopt a rule that a finding of retaliation necessitates a finding of willfulness).

Here, I need not define the legal relationship between the two (2) concepts.  As a factual

matter, for all the reasons discussed in Part V.C.4.-6., supra, I am satisfied that the evidence

supporting a finding of retaliation amply supports the corollary finding that the Knights' conduct

was willful within the meaning of the ADEA.

Ordinarily, the calculation of Olick's entitlement to liquidated damages would be made

by doubling his actual monetary losses ($1,797.83 x 2 = $3,597.66).  However, in this litigation,

Olick already obtained a judgment against Aetna with a value of $1,798.83.  I will reduce Olick's

liquidated damages award against the Knights by the amount of his recovery against Aetna.

In short, in light of the willful nature of the Knights' violation of the ADEA and the

serious consequences that may ensue from the wrongful termination of an individual's health

benefits, I conclude that it is appropriate and consistent with the deterrent purposes of the

remedial provision of the ADEA to assess liquidated damages in Olick's favor and against the

Knights in the amount of $1,797.83.[54]

## 4. punitive damages

As stated earlier, Olick requests that punitive damages be imposed on the Knights for what he considers to be its outrageous conduct.

Both the Supreme Court and the Third Circuit have held that the ADEA's liquidated damages provision was intended to be punitive in nature. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985); Starceski, 54 F.3d at 1099. It is less clear whether the ADEA provides for punitive damages separate and apart from the liquidated damages that themselves are punitive in nature. See Jordan v. Wilkes-Barre Gen. Hosp., 2008 WL 3981460, at *6 (M.D. Pa. Aug. 22, 2008). A number of circuit courts and courts in this district have found that punitive damages are barred under the ADEA. See id. (citing cases); see also McGehean, 2009 WL 1911618, at *2.

In this case, I need not reach this issue. Assuming arguendo that an award of punitive damages is an available remedy and that the level of the Knights' misconduct was sufficient to justify some type of exemplary award, I am satisfied that the award of statutory, liquidated damages and the reasonable costs in this case will serve the deterrent purposes of the remedial provision of the statute. See generally Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2621 (U.S.

---

[54]     I am aware that I am assessing separate, non-compensatory damages against the Knights under two (2) statutes (COBRA and the ADEA) based on the same core conduct: the Knights' backdating of Olick's termination date to his detriment. This is appropriate because the two (2) statutes have distinct purposes that justify separate enforcement remedies. The ADEA statutory damages, which are a function of Olick's actual damages, are appropriate because the Knights retaliated against Olick. The means employed by the Knights to retaliate, the misuse of the COBRA Notice in violation of Olick's rights, exacerbated the Knights' wrongful action, thereby justifying the invocation of the COBRA per diem methodology for assessing statutory damages. In granting all of this relief, I have been conscious of the combined, final outcome and have attempted to achieve a result that is harmonious with the deterrent purposes of the remedial provisions of both statutes. See also Part V.A.4., supra.

2008)  (punitive damages are intended to punish the tortfeasor and to deter him and others from

similar extreme conduct).

For this reason, Olick is not entitled to any additional punitive damages.

### 5.    attorney's fees and costs

Finally, under the ADEA, a prevailing plaintiff is entitled to an award of reasonable

attorney's fees and costs. See 29 U.S.C. § 626(b) (incorporating by reference 29 U.S.C. §

216(b)); Blum, 829 F.2d at 377; McGuffey v. Brink's, Inc, 598 F. Supp. 2d 659, 668 (E.D. Pa.

2009).

In this case, Olick is a pro se litigant. Therefore, he is not entitled to attorney's fees.  Cf.

Kay v. Ehrler, 499 U.S. 432 (1991) (pro se litigant may not collect attorneys fees under Civil

Rights Attorney's Fees Award Act); Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir.

1998) (Title VII); Pitts v. Vaughn, 679 F.2d 311, 313 (3d Cir. 1982) (Civil Rights Attorney's

Fees Award Act).  However, he is entitled to his reasonable costs incurred.  See generally, Olick,

2008 WL 3837759, *at 6-7 (discussing assessment of costs under Fed. R. Bankr. P. 7054 and 28

U.S.C. §1920).

As for Olick's entitlement to his costs, the intensely contentious nature of the litigation

between the parties makes it abundantly clear that it would be futile to rely upon the relatively

simple and ministerial procedure for assessment of costs employed in most cases.  See Fed. R.

Bankr. P. 7054.[55]  Therefore, to expedite the termination of this litigation, in the order

---

[55]    I have already written one (1) lengthy opinion on the subject of taxable costs in this case.
See n.37, supra.

accompanying this Opinion, I will establish deadlines for Olick to file an itemized statement of his costs and for the Knights to file any objections thereto.

### E.  Coda: Relief under the PHRA and the CFEPA

Finally, I write briefly to explain why the remedy discussion in this Opinion is limited almost entirely to the ADEA, even though Olick requested damages under two (2) state anti-discrimination statutes, the PHRA and the CFEPA.

As stated earlier, in determining liability, the state statutes are construed consistently with the ADEA.  See n.45, supra.  As for remedy, except for the potential recovery of damages for humiliation, emotional distress, and mental anguish, the relief available to Olick under the state statutes is no greater than that provided by the ADEA on the record made in this proceeding, and there is insufficient evidence in this case to warrant an award of damages for humiliation, emotional distress, and mental anguish.  See n.52, supra.[56]

Under the ADEA, I denied Olick two forms of requested relief:  punitive damages and attorney's fees.  Under the PHRA and the CFEPA, as under the ADEA, Olick is not entitled to punitive damages.  See Hoy v. Angelone, 720 A.2d 745, 749‑50 (Pa. 1998) (under PHRA); Chopra v. Gen. Elec. Co., 527 F. Supp. 2d 230, 246 (D. Conn. 2007)  ("[u]nder CFEPA, punitive damages are considered to be limited to fees and costs").  But cf. Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F. Supp. 2d 110, 117‑18 (D. Conn. 2002) (noting split in state

---

[56]        As discussed earlier, under the ADEA, a successful retaliation claim entitles a plaintiff to liquidated damages (i.e., double the actual monetary loss), attorney's fees and costs. Similarly, under the PHRA and CFEPA, Olick would be entitled to his monetary damages, attorney's fees and costs.  See 43 Pa. Stat. Ann. §962(c)(3); id. §962(c.2); Conn. Gen. Stat. Ann. § 46a-104.

trial courts on the issue).[57]

As for attorneys fees, under Pennsylvania law and Connecticut law, like federal law, pro se parties generally are not awarded attorney's fees under fee-shifting statutes.   See Maurice A. Nernberg & Assoc. v. Coyne, 920 A.2d 967, 972 (Pa. Commw. Ct. 2007); Westmoreland County Indus. Dev. Auth. v. Allegheny County Bd. of Prop. Assessment, 723 A.2d 1084, 1086-87 (Pa. Commw. Ct. 1999); Lev v. Lev, 524 A.2d 674, 677 (Conn. App. Ct. 1987); Larsen v. Town of Redding, 2009 WL 943046, at *6 (Conn. Super. Ct. Mar. 17, 2009) (unpublished). To the extent, I have any discretion to do so, I would not award Olick counsel fees in this case.

Finally, I point out that as a consequence of the remedial overlap among the ADEA, the PHRA and the CFEPA and the fact that the relief granted under the ADEA encompasses all of the relief Olick might be entitled to received under both state statutes, I need not engage in a choice of law analysis to determine whether Pennsylvania or Connecticut law applies in this case.

# VI. <u>CONCLUSION</u>

For the reasons discussed above, I will:

1. enter judgment in Olick's favor against the Knights in the amount of $1,797.83 on **COUNT I** (the retaliation claim) and in Olick's  favor and against the Knights on **COUNT III.A.** (the COBRA claim), in the amount of $13,200, for a combined judgment in the amount of $14,997.83;

---

[57]        In any event, even if Connecticut law applies and provides for punitive damages, I would not award Olick punitive damages in excess of the liquidated damages being awarded under the ADEA. See Part V.D.4, supra.

2.  enter judgment in favor of Defendant Kearney on Olick's retaliation claim, previously

    denoted as Count I;

3.  enter judgment in favor of the Defendant Knights on Olick's equitable claim under ERISA,

    previously denoted as Count III.C.;

4.  establish deadlines for Olick to file an itemization of his taxable costs and for the Knights to

    file any objection thereto.


    An Order consistent with this Opinion will be entered.




**Date:    December 28, 2009**                   _____

                                                 **ERIC L. FRANK**
                                                 **U.S. BANKRUPTCY JUDGE**